**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BRIAN WARMUTH, Derivatively and on Behalf of KRISPY KREME, INC.,<br><br>Plaintiff,<br><br>v.<br><br>JOSHUA CHARLESWORTH, MARISSA ANDRADA, DAVID BELL, PATRICIA CAPEL, DAVID DENO, OLIVIER GOUDET, PAUL MICHAELS, GERHARD PLEUHS, DEBBIE ROBERTS, PHILIP TELFER, MICHELLE WEESE, and JEREMIAH ASHUKIAN<br><br>Defendants,<br><br>and<br><br>KRISPY KREME, INC.,<br><br>Nominal Defendant. | C.A. No. ____________ |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Brian Warmuth ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively on behalf of Nominal Defendant Krispy Kreme, Inc. ("Krispy Kreme" or the "Company"), files this Verified Stockholder Derivative Complaint against Joshua Charlesworth ("Charlesworth"), Jeremiah Ashukian ("Ashukian"), Marissa Andrada ("Andrada"), David Bell ("Bell"), Patricia Capel ("Capel"), David Deno ("Deno"), Olivier Goudet ("Goudet"), Paul Michaels ("Michaels"), Gerhard Pleuhs ("Pleuhs"), Debbie Roberts ("Roberts"), Philip Telfer ("Telfer"), and Michelle Weese ("Weese") (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Krispy Kreme.

Plaintiff alleges the following against the Individual Defendants based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Krispy Kreme, news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, and public filings in the related federal securities class action lawsuit filed in the U.S. District Court for the Western District of North Carolina captioned *In re Krispy Kreme Securities Litigation*, No. 3:25-cv-00332-MOC-SCR (W.D.N.C.) (the "Securities Class Action"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of Krispy Kreme against the Individual Defendants seeking to remedy Defendants' violations of law that have occurred from March 26, 2024 through at least May 7, 2025 (the "Relevant Period"), and have caused, and continue to cause, substantial harm to Krispy Kreme and its shareholders, including monetary losses and damages to Krispy Kreme's reputation and goodwill.

2. Krispy Kreme is a doughnut company that emphasizes its ability to deliver fresh, premium-quality doughnuts daily across various consumer points of access. The Company operates both Company-owned and franchised store locations and partners with other retailers, including grocery stores, convenience stores, and fast-food restaurants. Krispy Kreme employs an

omnichannel approach designed to maximize consumer points of access, which constitutes a critical component of the Company's business model.

3. Prior to the Relevant Period, and in response to mounting losses and debt, Krispy Kreme altered its business model to place greater emphasis on partnerships with other retailers. As part of this shift, the Company adopted a "Delivered Fresh Daily" ("DFD") approach, which emphasized delivering fresh doughnuts to grocery stores, convenience stores, fast-food restaurants, and other similar retailers. In 2022, Krispy Kreme further pursued this strategy by announcing a partnership with McDonald's, one of the most well-known fast-food brands in the country.

4. Following a 2022-23 pilot program, during which Krispy Kreme tested the delivery of fresh doughnuts to McDonald's restaurants in select regional markets, the Company announced on March 26, 2024 that it would expand its partnership with McDonald's nationwide. In connection with the announced expansion, Krispy Kreme told investors that they could expect "[n]ationwide availability at participating restaurants . . . by the end of 2026" through a "phased market rollout across the country," and that Krispy Kreme would "more than double [its] points of access" on the same timeline. In support of this planned expansion, Krispy Kreme further claimed that it had been "scaling its supply chain, building a support team, adding technology and new equipment, and enhancing field training to support its Delivered Fresh Daily expansion, which includes this phased rollout." The Company projected that the expansion of its partnership with McDonald's would generate more than $400 million in annual revenue growth. Following the announcement, Krispy Kreme's stock price surged nearly 40% on abnormally high trading volume, reaching levels the Company's stock had not seen in years.

5. Critically, the success of Krispy Kreme's partnership with McDonald's depended entirely on the Company's ability to deliver fresh doughnuts daily to thousands of McDonald's franchises across the country. Because doughnuts go stale after a day, and Krispy Kreme had built its brand on providing "***fresh doughnuts daily***,"[1] it was essential that the Company possess the infrastructure and logistics necessary to make those daily deliveries and to do so profitably. Indeed, the Company's officers emphasized this very point, stating that Krispy Kreme's DFD strategy required the Company to become a "***doughnut logistics company***," and that Defendants were therefore intently focused on ensuring that Krispy Kreme's "***doughnuts always arrive at the right time, right quality***."

6. During the Relevant Period, Defendants repeatedly represented to investors that Krispy Kreme possessed the infrastructure and operational capabilities necessary to meet the stringent requirements of its agreement with McDonald's. On March 26, 2024, which marked the beginning of the Relevant Period, Defendants announced plans to expand into approximately 12,000 McDonald's locations nationwide. In addressing Krispy Kreme's ability to carry out this nationwide expansion, Defendants represented that the Company could complete approximately half of the planned rollout, covering the first 6,000 McDonald's locations, through its "***existing capacity***." Defendants further indicated that only modest investments in items such as "***trucks and drivers***" would be necessary because the expansion would "***leverag[e] an underutilized system.***" Moreover, when analysts raised concerns regarding the costs associated with the nationwide expansion, Defendants sought to assure the market that Krispy Kreme was "***not ramping up CapEx over the next couple years to fund some of the expansion in the US.***"

---

[1] Emphasis added unless otherwise stated.

7. Throughout the Relevant Period, Defendants also represented to investors that Krispy Kreme was "***not subject to capital expenditure commitments or obligations specific*** to the relationship ***with*** McDonald's," and that its capital expenditures "***support the overall DFD and retail channels and are not directly attributable to, or required by***, the agreement with McDonald's." Thus, throughout the Relevant Period, Defendants consistently conveyed to investors that consumer demand had been validated, the Company's operations were performing successfully, costs remained under control, and the McDonald's expansion was "on track."

8. Contrary to Defendants' representations, Krispy Kreme lacked, from the inception of the deal, the infrastructure necessary to deliver its products to McDonald's on a daily basis, resulting in the failure of the McDonald's partnership.

9. Operational deficiencies in Krispy Kreme's infrastructure immediately resulted in increased costs associated with hiring additional drivers, purchasing additional equipment mandated by the McDonald's contract, and remediating outdated baking facilities. As the rollout progressed, these costs increased dramatically and exponentially. Defendants were well aware of these problems, as they were directly confronted with widespread execution problems and concerns regarding the mounting costs.

10. Further, an internal project conducted in the summer of 2023, known as "Project Ray," detailed the magnitude of the investments required for the McDonald's expansion. Executives responsible for the project repeatedly raised concerns regarding those required expenditures, warning Defendants: "[A]re you sure you want to proceed if it's going to cost this much money up front?" Defendants also regularly touted their ability to access sales and operational data in real time, further underscoring their knowledge of these widespread issues.

11. Operationally, the deficiencies in Krispy Kreme's infrastructure were so extensive that the Company lacked basic safety and quality-control protocols and routinely made deliveries late or missed them altogether, with "***[n]one of the doughnuts were going out the same day.***" Even when deliveries occurred, the Company's "***quality was just so inconsistent***," and numerous McDonald's locations regularly received stale doughnuts that were "***24 to 36 hours old***" and that "***looked like garbage.***" These deficiencies in quality and service, in turn, undercut consumer demand, causing numerous McDonald's locations to drastically reduce their orders within weeks after the rollout began. According to one former employee, sales at numerous McDonald's locations fell "***down to two or three dozen per store***," an amount that did not even cover the driver's hourly rate required to deliver such a small quantity of doughnuts: "***[Y]ou figure out pretty quickly that it's not sustainable.***"

12. Approximately three months after Defendants had touted the supposedly "successful start to [the] nationwide McDonald's rollout," the truth began to emerge. On February 25, 2025, Krispy Kreme disclosed that it had "seen consumer softness" specifically in connection with its McDonald's expansion and acknowledged that "demand has dipped actually a little lower than we expected." Defendants further disclosed that Krispy Kreme was experiencing difficulties delivering its products as required under the McDonald's partnership and, as a result, would need to rely on a third-party delivery company for "more than half" of the Company's deliveries.

13. Following this disclosure, Krispy Kreme's stock price fell 35% over the ensuing two days, closing at $5.97 per share on February 26, 2025. Analysts immediately identified the McDonald's expansion as the source of the Company's difficulties. Evercore attributed the Company's results to the "McDonald's start-up costs," while Morgan Stanley concluded that operating expenses "drove most of the unfavorability."

14. Despite these disclosures, Defendants sought to limit a further decline in Krispy Kreme's stock price by assuring investors that the problems were temporary and did not affect the Company's ability to perform under the McDonald's agreement. Defendants continued to attribute weak demand at McDonald's locations to insufficient marketing and consumer "awareness" that Krispy Kreme doughnuts were available at McDonald's stores. Defendants further maintained that the McDonald's rollout "***remain[ed] on track to reach about 6,000 restaurants by year-end***," noting that Krispy Kreme had expanded into New York locations that very morning after receiving "very positive" feedback from McDonald's. Defendants also sought to reassure investors regarding the costs associated with the rollout, representing that the Company had identified "***more and more ways to leverage our existing capacity***" and had "***increased productivity at our existing hubs" to "get doughnuts out to points of access better and better***."

15. Approximately two months later, the full truth emerged. On May 8, 2025, Defendants disclosed to investors that the Company's partnership with McDonald's, which was central to Krispy Kreme's growth strategy, had failed, and that the Company had effectively abandoned the rollout. Although Defendants had represented on February 25, 2025 that the McDonald's expansion "remain[ed] on track" and was proceeding according to plan, Defendants revealed that the Company had actually halted the expansion at the same time those representations were made. Specifically, Defendants disclosed that Krispy Kreme had not opened a single additional McDonald's location since February 25, 2025, and that the Company "***[did] not expect to launch in any additional restaurants in [the second quarter of 2025].***"

16. Further, Defendants disclosed that, contrary to their prior assurances concerning Krispy Kreme's infrastructure, operational capabilities, and the need for additional capital expenditures, the Company's operations had been materially affected by increased "***costs***

***associated with our U.S. nationwide expansion.***" Krispy Kreme's operational deficiencies were sufficiently significant that the Company would cease attempting to distribute its doughnuts to its retail partners itself and instead "***fully outsource U.S. logistics***" in an effort to reduce costs and "***simplify [] operations***." Against this backdrop, Krispy Kreme reported just $15.9 million in adjusted EBITDA for its U.S. segment, representing ***a stunning 62% decline*** compared with the prior-year quarter. The Company further withdrew its 2025 outlook in its entirety without issuing replacement guidance and eliminated its quarterly dividend to conserve cash.

17. Following this disclosure, Krispy Kreme's stock price fell 37% over the next two days, declining from $4.33 per share to just $2.73 per share. At $2.73 per share, the Company's stock was trading more than 84% below its Relevant Period high of $17.35, which it had reached following the announcement of the McDonald's partnership.

18. Analysts sharply criticized management and questioned Defendants' credibility because the Company's disclosures directly conflicted with Defendants' prior assurances to investors. On May 8, 2025, Truist emphasized that Defendants had only recently represented that the rollout was proceeding as "***expected***," and expressed that they were "***shocked***" by the announcement because ***"[m]anagement provided a 'everything going as planned message' on the 4Q earnings call in early February and at several conferences YTD.***" Morgan Stanley likewise characterized the decision to halt the rollout as "***surprising***" in light of Defendants' prior representations, noting that Defendants had announced "plans as recent[ly] as February [] to be in 6,000 locations by year end." Similarly, J.P. Morgan observed that the "***McDonald's decision comes as [a] surprise***" and emphasized that the Company's abrupt decision to stop the expansion after launching only 20% of the expected locations "***speaks volumes***" as to just how poorly the expansion was proceeding.

19. The harm to Krispy Kreme from the Individual Defendants' misconduct continued beyond the Relevant Period. On June 24, 2025, Krispy Kreme announced the complete termination of its partnership with McDonald's, specifically attributing the decision to the arrangement's "unsustainable" costs. The Company's subsequent disclosures also contradicted Defendants' prior representations that the substantial investments made during the Relevant Period were not specific to McDonald's and instead benefited Krispy Kreme's broader DFD operations. Krispy Kreme disclosed that the McDonald's partnership contributed to at least ***$51 million*** in asset impairments and termination costs, as well as a ***$356 million*** goodwill impairment that the Company likewise attributed in part to the McDonald's partnership. The Company also underwent substantial leadership changes, replacing its CFO, removing its Director of Field Operations, appointing two different Chief Growth Officers in rapid succession, and ultimately replacing six of its eleven Board members.

20. Ultimately, the Individual Defendants' breaches of fiduciary duty erased well over $500 million of Krispy Kreme's market capitalization and exposed the Company to substantial liability in the Securities Class Action. Through this action, Plaintiff seeks to recover, on behalf of Krispy Kreme, the damages the Company has sustained as a result of the Individual Defendants' misconduct.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 14a-9 promulgated thereunder.

22. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23. In connection with the acts, conduct, and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

24. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

25. This Court has personal jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

26. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Defendants have conducted business in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

### Plaintiff

27. Plaintiff is, and has been at all relevant times, a shareholder of Krispy Kreme.

### Nominal Defendant

28. Nominal Defendant Krispy Kreme is incorporated under the laws of Delaware, with its principal executive office located at 2116 Hawkins Street, Charlotte, North Carolina 28203. Krispy Kreme common stock trades on the NASDAQ under the ticker symbol "DNUT."

### Individual Defendants

**Defendant Charlesworth**

29. Defendant Charlesworth has served as the Chief Executive Officer ("CEO") and a member of the Company's Board of Directors (the "Board") since January 2024. Previously,

Charlesworth served as the Chief Operating Officer ("COO") and the Chief Financial Officer ("CFO") for the Company. Charlesworth is a named defendant in the Securities Class Action.

30. The Company's most recent Proxy Statement, filed with the SEC on April 27, 2026 (the "2026 Proxy"), stated, in part, the following about Defendant Charlesworth:

> **JOSHUA CHARLESWORTH**
>
> **PRESIDENT AND CHIEF EXECUTIVE OFFICER, KKI**
>
> **Biographical Information**
> Joshua Charlesworth has served as a member of our Board and as our President and Chief Executive Officer since January 2024. He served as our Global President from June 2022 to December 2023 and our Chief Operating Officer from May 2019 to December 2023. Mr. Charlesworth served as our Chief Financial Officer from April 2017 to January 2023 and our Corporate Secretary from July 2018 to August 2020. Prior to joining Krispy Kreme, Mr. Charlesworth held various leadership positions at Mars, Incorporated. He most recently served as Global Chief Financial Officer of Mars Chocolate from January 2015 to April 2017.
>
> **Qualifications**
> Mr. Charlesworth holds a B.Sc. in Economics from the London School of Economics and is a member of the Chartered Institute of Management Accountants. We believe Mr. Charlesworth's extensive executive-level experience in the food and retail industries, as well as his role as our President and Chief Executive Officer, qualifies him to serve on our Board.

31. According to the Proxy Statements filed with the SEC, in fiscal years 2024 and 2025, Defendant Charlesworth received $2,510,455 and $3,693,795, respectively, in compensation from the Company.

| Fiscal Year | Salary ($) | Stock Awards ($) | Option Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|
| 2025 | 1,000,000 | 2,124,677 | 553,000 | 16,118 | 3,693,795 |
| 2024 | 999,039 | 1,000,012 | | 511,404 | 2,510,455 |

32. As of April 19, 2024, Defendant Charlesworth beneficially owned 770,856 shares of Krispy Kreme common stock which was valued at approximately $10,514,475.84. On April 10, 2025, Charlesworth beneficially owned 865,070 shares of Krispy Kreme with the value of

approximately $3,711,150.30. By April 7, 2026, Charlesworth beneficially owned 1,094,779 shares of Krispy Kreme common stock, and the value of those shares was approximately $3,634,666.28.[2]

**Defendant Capel**

33. Defendant Capel has served as a director of Krispy Kreme since 2024, and Chair of the Board since 2025.

34. The Company's 2026 Proxy stated, in part, the following about Defendant Capel:

> **PATRICIA CAPEL**
>
> **SENIOR PARTNER AND GLOBAL HEAD OF HUMAN CAPITAL, JAB HOLDING COMPANY**
>
> **Biographical Information**
> Patricia Capel has served as a member of our Board since June 2024 and as Board Chair since 2025. She previously served as a member of our Board from April 2021 to September 2022. Ms. Capel is currently a Senior Partner and Global Head of Human Capital at JAB Holding Company, where she joined as a Partner in 2021. Ms. Capel leads JAB's overall people strategy, overseeing talent, compensation, organizational development, and leadership initiatives across the firm and its portfolio companies to support long-term growth and performance. Previously, Ms. Capel spent 25 years at Anheuser-Busch InBev SA/NV ("AB InBev") in a series of senior leadership roles, including Vice President of Finance for Central and Eastern Europe, leadership roles supporting major M&A integrations, and Vice President of Global People (HR), where she oversaw global talent attraction, development, and remuneration. She also served as President of the Andina Business Unit, leading commercial operations across Chile, Bolivia, and Paraguay. Earlier in her career, Ms. Capel held roles at PwC and Cargill Agrícola S.A. Ms. Capel is currently a member of the board of directors and remuneration and nomination committee of Coty, Inc. (NYSE: COTY), and she is a member of the boards of directors of Panera Brands, Inc., and several other JAB controlled companies.
>
> **Qualifications**
> Ms. Capel holds a Bachelor's degree in Business Administration from Universidade de São Paulo, and an M.B.A. from Business School São Paulo. We believe that Ms. Capel's significant experience with global companies and

[2] Valuations of the Individual Defendants' holdings of Company stock are calculated using the closing price of Krispy Kreme common stock of $13.64 per share on April 19, 2024, the closing price of Krispy Kreme common stock of $4.29 per share on April 10, 2025, and the closing price of Krispy Kreme common stock of $3.32 per share on April 7, 2026.

expertise in the consumer products industry qualifies her to serve on our Board.

35. According to the Proxy Statements filed with the SEC, in fiscal years 2024 and 2025, as a non-employee director, Defendant Capel received $30,000 and $363,231, respectively, in compensation from the Company.

| Fiscal Year | Fees Earned or Paid in Cash ($) | Cash Retainers Earned ($) | Equity Grant ($) | Total ($) |
|---|---|---|---|---|
| 2025 | | 113,228 | 250,003 | 363,231 |
| 2024 | 30,000 | | | 30,000 |

36. As of April 10, 2025, Defendant Capel beneficially owned 6,334 shares of Krispy Kreme common stock which was valued at approximately $27,172.86. By April 7, 2026, Capel beneficially owned 6,334 shares of Krispy Kreme with the value of approximately $21,028.88.

**Defendant Deno**

37. Defendant Deno has served as a director of Krispy Kreme since 2016 and currently serves as Lead Independent Director and Chair of the Audit and Finance Committee (the "Audit Committee").

38. The Company's 2026 Proxy stated, in part, the following about Defendant Deno:

> **DAVID DENO**
> **FORMER CHIEF EXECUTIVE OFFICER, BLOOMIN' BRANDS, INC.**
>
> **Biographical Information**
> David Deno has served as a member of our Board since September 2016. Mr. Deno is the retired Chief Executive Officer of Bloomin' Brands, Inc. (NASDAQ: BLMN, "Bloomin' Brands"), a position he held from March 2019 to December 2024. Mr. Deno served as the Chief Financial and Administrative Officer of Bloomin' Brands from 2012 to 2019. As Chief Financial Officer of Bloomin' Brands, Mr. Deno led the company's successful initial public offering, including establishing financial processes and systems to enable continued success, led the company through the difficult COVID period, and executed a successful strategy including investments in the U.S. brands and Brazilian team to enable the company to operate as one of the top casual dining restaurant companies in the world. Mr. Deno's career has included more than 15 years in senior level operations and financial positions at

PepsiCo, Inc. (NASDAQ: PEP) and YUM! Brands, Inc. (NYSE: YUM, formerly a subsidiary of PepsiCo) where he served as Chief Financial Officer and then Chief Operating Officer. As Chief Financial Officer at YUM! Brands, he helped set the strategy for a new public company and establish financial processes and systems to enable success. As a result, YUM! grew its U.S. and International business significantly, resulting in a significant increase in shareholder value. He previously served as a member of the board of directors of Bloomin' Brands, Peet's Coffee, and Caribou/Einstein Bagels. Mr. Deno is currently a member of the board of directors of Panera Brands.

**Qualifications**
Mr. Deno holds a B.A. in Economics and Political Science from Macalester College and an M.B.A. from the University of Michigan. We believe that Mr. Deno's experience working with global brands in the consumer products industry, extensive management experience as a Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer, and deep understanding of financial control matters qualifies him to serve on our Board.

39. According to the Proxy Statements filed with the SEC, in fiscal years 2024 and 2025, as a non-employee director, Defendant Deno received $175,013 and $213,271, respectively, in compensation from the Company.

| Fiscal Year | Fees Earned or Paid in Cash ($) | Cash Retainers Earned ($) | Stock Awards ($) | Equity Grant ($) | Total ($) |
|---|---|---|---|---|---|
| 2025 | | 83,269 | | 130,002 | 213,271 |
| 2024 | 75,000 | | 100,013 | | 175,013 |

40. As of April 19, 2024, Defendant Deno beneficially owned 71,835 shares of Krispy Kreme common stock which was valued at approximately $979,829.40. On April 10, 2025, Deno beneficially owned 82,046 shares of Krispy Kreme common stock with the approximate value of $351,977.34. By April 7, 2026, Deno beneficially owned 93,032 shares of Krispy Kreme common stock which was valued at approximately $308,866.24.

**Defendant Andrada**

41. Defendant Andrada served as a director of Krispy Kreme from February 2022 until June 10, 2026, and during the Relevant Period served as Chair of the Compensation,

Nomination, and Governance Committee (formerly known as the Remuneration and Nomination Committee) (the "CNG Committee").

42. The Company's Proxy Statement filed with the SEC on April 28, 2025 (the "2025 Proxy"), stated, in part, the following about Defendant Andrada:

> **MARISSA ANDRADA**
>
> **FORMER CHIEF DIVERSITY, INCLUSION AND PEOPLE OFFICER, CHIPOTLE MEXICAN GRILL**
>
> **Biographical Information**
> Marissa Andrada has served as a member of our Board since February 2022. Ms. Andrada served as Chief Diversity, Inclusion and People Officer of Chipotle Mexican Grill (NYSE: CMG, "Chipotle") from July 2020 to August 2022. She served as Chipotle's Chief People Officer from April 2018 to June 2020. Prior to joining Chipotle, Ms. Andrada served as Senior Vice President of Human Resources & Chief Human Resources Officer of Kate Spade & Company/tapestry (Coach, Inc.) from July 2016 to October 2017. From November 2010 to March 2016, she held various Senior Vice President positions at Starbucks Coffee Company (NASDAQ: SBUX). She has also served as the head of human resources for various other companies, including GameStop Corporation (NYSE: GME) and Red Bull North America, Inc.
>
> **Qualifications**
> Ms. Andrada holds an M.B.A. from Pepperdine University and a B.S. in Business Administration from California State Polytechnic University at Pomona. We believe that Ms. Andrada's significant experience in the quick service restaurant and retail industries qualifies her to serve on our Board.

43. According to the Proxy Statements filed with the SEC, in fiscal years 2024 and 2025, as a non-employee director, Defendant Andrada received $170,013 and $208,079, respectively, in compensation from the Company.

| Fiscal Year | Fees Earned or Paid in Cash ($) | Cash Retainers Earned ($) | Stock Awards ($) | Equity Grant ($) | Total ($) |
|---|---|---|---|---|---|
| 2025 | | 78,077 | | 130,002 | 208,079 |
| 2024 | 70,000 | | 100,013 | | 170,013 |

44. As of April 10, 2025, Defendant Andrada beneficially owned 4,140 shares of Krispy Kreme common stock which was valued at approximately $17,760.60. By April 7, 2026, Andrada beneficially owned 9,468 shares of Krispy Kreme with the value of approximately $31,433.76.

**Defendant Bell**

45. Defendant Bell served as a director of Krispy Kreme from September 2016 until June 2025.

46. The Company's Proxy Statement filed with the SEC on April 24, 2024 (the "2024 Proxy"), stated, in part, the following about Defendant Bell:

> **DAVID BELL**
>
> **SENIOR PARTNER, JAB HOLDING COMPANY**
>
> **Biographical Information**
> David Bell has served as a member of our Board since September 2016. Mr. Bell is currently a Senior Partner at JAB Holding Company, where he joined as a Partner in 2012. Prior to that, Mr. Bell held various positions in corporate development and corporate strategy at Mars, Incorporated from 2008 to 2012. Mr. Bell also held various positions at Goldman Sachs, including serving as Vice President, from 2000 to 2008. Prior to that, Mr. Bell served as an associate at Perseus, L.L.C. from 1996 to 1998 and Senior Auditor at PricewaterhouseCoopers LLC from 1993 to 1996. Mr. Bell is also currently a member of the board of directors of Panera Bread Company, JAB Holding Company, and NVA Management LLC.
>
> **Qualifications**
> Mr. Bell holds a B.S. in Commerce from the University of Virginia and an MBA from the Wharton School at the University of Pennsylvania. We believe that Mr. Bell's significant financial and industry experience qualifies him to serve on our Board.

47. According to the Proxy Statements filed with the SEC, in fiscal years 2024 and 2025, as a non-employee director, Defendant Bell received $160,013 and $30,000, respectively, in compensation from the Company.

| | Fees Earned or Paid in Cash | | | |
|---|---|---|---|---|

| Fiscal Year | ($) | Cash Retainers Earned ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|---|
| 2025 | | 30,000 | | 30,000 |
| 2024 | 60,000 | | 100,013 | 160,013 |

48. As of April 19, 2024, Defendant Bell beneficially owned 52,957 shares of Krispy Kreme common stock which was valued at approximately $722,333.48. By April 10, 2025, Bell beneficially owned 63,168 shares of Krispy Kreme with the value of approximately $270,990.72.

**Defendant Goudet**

49. Defendant Goudet served as a director of Krispy Kreme from September 2016 until June 2025. Goudet was the Chair of the Board from May 2017 until his departure at the Company's 2025 annual meeting.

50. The Company's 2024 Proxy stated, in part, the following about Defendant Goudet:

> **OLIVIER GOUDET**
>
> **SENIOR INVESTMENT ADVISOR, JAB HOLDING COMPANY**
>
> **Biographical Information**
> Olivier Goudet has served as a member of the Board since September 2016 and as Chairman since May 2017. Mr. Goudet is currently a Senior Investment Advisor at JAB Holding Company, where he was previously Managing Partner and Chief Executive Officer from 2012 to 2023. He is also currently the Chairman of the board of directors of JDE Peets (AMS: JDEP) and a member of the board of directors of Keurig Dr. Pepper (NASDAQ: KDP), Coty Inc. (NYSE: COTY), and several other JAB controlled Companies. Mr. Goudet is the former Executive Vice President and Chief Financial Officer of Mars, Inc. and has served as an independent advisor to the of Mars Board of Directors. Mr. Goudet began his career at Mars, Inc. serving on the finance team of its French business and held several senior executive positions at the VALEO Group, including Group Finance Director.
>
> **Qualifications**
> Mr. Goudet holds a degree in Engineering from l'Ecole Centrale de Paris and graduated from the ESSEC Business School in Paris with a major in Finance. We believe that Mr. Goudet's extensive financial expertise and senior executive experience, as well as significant governance and oversight experience attained through his tenure as a director of several public companies, qualifies him to serve on our Board.

51. According to the Proxy Statements filed with the SEC, in fiscal years 2024 and 2025, as a non-employee director, Defendant Goudet received $455,010 and $100,000, respectively, in compensation from the Company.

| Fiscal Year | Fees Earned or Paid in Cash ($) | Cash Retainers Earned ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|---|
| 2025 | | 100,000 | | 100,000 |
| 2024 | 200,000 | | 255,010 | 455,010 |

52. As of April 19, 2024, Defendant Goudet beneficially owned 2,110,495 shares of Krispy Kreme common stock, representing approximately 1.3% of the outstanding shares of Krispy Kreme common stock with an approximate value of $28,787,151.80. By April 10, 2025, Goudet beneficially owned 2,139,262 shares of Krispy Kreme, which again represented 1.3% of the outstanding shares of Krispy Kreme common stock with the value of approximately $9,177,433.98.

**Defendant Michaels**

53. Defendant Michaels served as a director of Krispy Kreme from May 2017 until June 2025 and was a member of the Audit Committee and the CNG Committee during the Relevant Period.

54. The Company's 2024 Proxy stated, in part, the following about Defendant Michaels:

> **PAUL MICHAELS**
>
> **FORMER CHIEF EXECUTIVE OFFICER, MARS, INC.**
>
> **Biographical Information**
> Paul S. Michaels has served as a member of our Board since May 2017 and serves as Lead Independent Director and Vice Chairman. Mr. Michaels served as the Chief Executive Officer of Mars from 2004 to January 2015. Before joining Mars, Mr. Michaels spent 15 years at Johnson & Johnson (NYSE: JNJ) in multiple consumer divisions. Since his retirement he has actively participated as an independent director on the following boards: Coty Inc. (NYSE: COTY) from June 2015 to December 2020, Dyla LLC since January 2018, Compassion First Vet

Hospitals from May 2019 to December 2020, and Keurig Dr. Pepper Inc. (NASDAQ: KDP) since July 2018.

**Qualifications**
Mr. Michaels holds a B.A. from the University of Notre Dame. We believe that Mr. Michaels' expertise and creativity in launching, building, and supporting global brands in the consumer products industry and his extensive executive experience with complex multinational consumer product organizations qualifies him to serve on our Board.

55. According to the Proxy Statements filed with the SEC, in fiscal years 2024 and 2025, as a non-employee director, Defendant Michaels received $190,013 and $40,000, respectively, in compensation from the Company.

| Fiscal Year | Fees Earned or Paid in Cash ($) | Cash Retainers Earned ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|---|
| 2025 | | 40,000 | | 40,000 |
| 2024 | 90,000 | | 100,013 | 190,013 |

56. As of April 19, 2024, Defendant Michaels beneficially owned 528,403 shares of Krispy Kreme common stock which was valued at approximately $7,207,416.92. By April 10, 2025, Michaels beneficially owned 752,806 shares of Krispy Kreme with the value of approximately $3,229,537.74.

**Defendant Pleuhs**

57. Defendant Pleuhs served as a director of Krispy Kreme from June 2022 until June 10, 2026, and was a member of the Audit Committee and the CNG Committee throughout the Relevant Period.

58. The Company's 2025 Proxy stated, in part, the following about Defendant Pleuhs:

**GERHARD W. PLEUHS**
**FORMER EXECUTIVE VICE PRESIDENT, CORPORATE & LEGAL AFFAIRS AND GENERAL COUNSEL, MONDELEZ INTERNATIONAL, INC.**

**Biographical Information**
Gerhard W. Pleuhs has served as a member of our Board since June 2022. Mr.

> Pleuhs was appointed as interim Lead Independent Director in December 2024 and as Lead Independent Director in April 2025. He currently serves as a member of the board of directors of Panera Brands, Inc. From 2019 until his retirement in 2021, Mr. Pleuhs served as Executive Vice President, Corporate & Legal Affairs and General Counsel for Mondelēz International, Inc. (NASDAQ: MDLZ, "MDLZ"). In this role, he oversaw MDLZ's communications, sustainability, and public and government affairs teams as well as the legal, corporate secretarial, compliance, and security functions. Prior to being elevated to this role, Mr. Pleuhs served as MDLZ's Executive Vice President and General Counsel between 2012 and 2019. During his more than 30-year career with MDLZ (formerly Kraft Foods Inc. "Kraft"), Mr. Pleuhs led the legal workstream to successfully spin off Kraft's North American grocery operations into the company that is now The Kraft Heinz Company. In addition, Mr. Pleuhs was involved in and negotiated multiple multi-billion M&A transactions, including Cadbury, and successfully managed so-called activist investor involvement in the MDLZ board of directors. During his career, he has also served as a director on the board of directors of each of the following: the Supervisory Board Kraft Foods Deutschland Holding GmbH (President from 2008-2015), Dong Suh Foods Corporation in Seoul, Korea, JDE Peet's N.V. (AMS: JDEP), and Keurig Dr. Pepper, Inc. (NASDAQ: KDP).
>
> **Qualifications**
> Mr. Pleuhs holds a law degree from the Christian-Albrechts-University of Kiel, Germany. Mr. Pleuhs brings extensive experience developing and executing strategic decisions, including related to M&A, investor relations, and corporate and government affairs, as well as serving on the boards of directors of national and international companies. We believe that Mr. Pleuhs' extensive management experience and expertise in corporate governance, compliance, and risk management, as well as his knowledge of the global food retail industry qualifies him to serve on our Board.

59. According to the Proxy Statements filed with the SEC, in fiscal years 2024 and 2025, as a non-employee director, Defendant Pleuhs received $170,013 and $222,887, respectively, in compensation from the Company.

| Fiscal Year | Fees Earned or Paid in Cash ($) | Cash Retainers Earned ($) | Stock Awards ($) | Equity Grant ($) | Total ($) |
|---|---|---|---|---|---|
| 2025 | | 92,885 | | 130,002 | 222,887 |
| 2024 | 70,000 | | 100,013 | | 170,013 |

60. As of April 7, 2026, Defendant Pleuhs beneficially owned 8,359 shares of Krispy Kreme common stock which was valued at approximately $27,751.88.

**Defendant Roberts**

61. Defendant Roberts served as a director of Krispy Kreme from April 2021 until June 2025.

62. The Company's 2024 Proxy stated, in part, the following about Defendant Roberts:

> **DEBBIE ROBERTS**
>
> **EXECUTIVE VICE PRESIDENT, CHIEF OPERATING OFFICER, PANERA BREAD COMPANY**
>
> **Biographical Information**
> Debbie Roberts has served as a member of our Board since April 2021. Ms. Roberts currently serves as Executive Vice President and Chief Operating Officer of Panera Bread, a position she has held since September 2020. Before joining Panera, Ms. Roberts held various roles at McDonald's Corporation (NYSE: MCD) since 1990. Most recently at McDonald's Ms. Roberts served as the President Northeast Zone from December 2014 to December 2016, and the President East Zone from January 2016 to April 2018. She currently serves as a member of the Board of RLI Insurance Company (NYSE:RLI).
>
> **Qualifications**
> Ms. Roberts holds a B.S. in Accounting from University of Illinois Urbana-Champaign. We believe that Ms. Roberts' extensive management experience in the food and beverage industry and financial expertise qualifies her to serve on our Board.

63. According to the Proxy Statements filed with the SEC, in fiscal years 2024 and 2025, as a non-employee director, Defendant Roberts received $160,013 and $30,000, respectively, in compensation from the Company.

| Fiscal Year | Fees Earned or Paid in Cash ($) | Cash Retainers Earned ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|---|
| 2025 | | 30,000 | | 30,000 |
| 2024 | 60,000 | | 100,013 | 160,013 |

64. As of April 10, 2025, Defendant Roberts beneficially owned 9,090 shares of Krispy Kreme common stock which was valued at approximately $38,996.10.

**Defendant Telfer**

65. Defendant Telfer served as a director of Krispy Kreme from September 2022 until June 2025 and was a member of the Audit Committee throughout the Relevant Period.

66. The Company's 2024 Proxy stated, in part, the following about Defendant Telfer:

> **PHILIP TELFER**
>
> **FORMER CORPORATE FINANCE STAFF OFFICER, MARS ASIA PACIFIC**
>
> **Biographical Information**
> Philip Telfer has served as a member of our Board since September 2022. Mr. Telfer held senior finance and leadership roles with Mars, Incorporated, including as the Vice President, Finance for Mars Australia/New Zealand, and then the Corporate Finance Staff Officer for Mars Asia Pacific from 2003 to 2011. Prior to joining Mars, Mr. Telfer held finance executive roles with Jardine Matheson Group (OTCMKTS: JMHLY) in Hong Kong, Thailand, and Singapore. Mr. Telfer is currently a private investor based in Australia.
>
> **Qualifications**
> Mr. Telfer holds a Bachelor of Commerce from the University of New South Wales, Australia. We believe that Mr. Telfer's expertise in global financial management and the food retail industry qualifies him to serve on our Board.

67. According to the Proxy Statements filed with the SEC, in fiscal years 2024 and 2025, as a non-employee director, Defendant Telfer received $165,013 and $32,500, respectively, in compensation from the Company.

| Fiscal Year | Fees Earned or Paid in Cash ($) | Cash Retainers Earned ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|---|
| 2025 | | 32,500 | | 32,500 |
| 2024 | 65,000 | | 100,013 | 165,013 |

**Defendant Weese**

68. Defendant Weese served as a director of Krispy Kreme from December 2020 until June 2025.

69. The Company's 2024 Proxy stated, in part, the following about Defendant Weese:

> **MICHELLE WEESE**
>
> **EXECUTIVE VP OF CORPORATE AFFAIRS, NOVARTIS AG**

**Biographical Information**
Michelle Weese has served as a member of our Board since December 2020. Ms. Weese currently serves as the Executive Vice President of Corporate Affairs for Novartis AG, a Swiss multinational pharmaceutical corporation based in Basel, Switzerland, a position she has held since July 2023. Prior, Ms. Weese served as Chief Corporate Affairs Officer for Bristol Myers Squibb (NYSE: BMY), a position she has held since June 2021. Before joining Bristol Myers Squibb, from January 2019 to March 2021, Ms. Weese served as the General Secretary North America and member of the North American executive team at France-based Danone (OTCMKTS: DANOY), a $30B food and beverage company and largest certified B-Corp in the world. Prior to Danone, Ms. Weese was the Chief Executive Officer of Stratigence, LLC, a management consulting agency, from 2009 to 2019. Prior to creating Stratigence, Ms. Weese was the Global Head of Corporate Communications for Mars, Incorporated across all brands and businesses. In her more than a decade at Mars, she also served as Senior Vice President of Corporate Affairs North America and held a seat on the North American management team across all brands and divisions.

**Qualifications**
Ms. Weese holds a B.A. in Journalism from Georgia State University. We believe that Ms. Weese's significant management and finance experience gained through senior leadership positions at several major corporations qualifies her to serve on our Board.

70. According to the Proxy Statements filed with the SEC, in fiscal years 2024 and 2025, as a non-employee director, Defendant Weese received $160,013 and $30,000, respectively, in compensation from the Company.

| Fiscal Year | Fees Earned or Paid in Cash ($) | Cash Retainers Earned ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|---|
| 2025 | | 30,000 | | 30,000 |
| 2024 | 60,000 | | 100,013 | 160,013 |

As of April 10, 2025, Defendant Weese beneficially owned 4,140 shares of Krispy Kreme with the value of approximately $17,760.60.

**Defendant Ashukian**

71. Defendant Ashukian served as the CFO of Krispy Kreme from January 2023 until July 11, 2025. Ashukian is a named defendant in the Securities Class Action.

72. The Company's 2025 Proxy stated, in part, the following about Defendant Ashukian:

> Jeremiah Ashukian, age 45, has served as our Executive Vice President and Chief Financial Officer since January 2023. Prior to joining Krispy Kreme, he held various chief financial officer roles across North America and Latin America at Mars, Incorporated. Mr. Ashukian held several finance positions earlier in his career across all aspects of the finance function and has extensive experience in building diverse and effective teams, functional and business transformations, integrations, M&A, and portfolio management. Mr. Ashukian holds an undergraduate degree in Mathematics from Sir Wilfrid Laurier University as well as C.M.A. and C.P.A. designations from Ontario, Canada.

73. According to the Proxy Statements filed with the SEC, in fiscal years 2024 and 2025, Defendant Ashukian received $1,777,486 and $1,125,089, respectively, in compensation from the Company.

| Fiscal Year | Salary ($) | Stock Awards ($) | Option Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|
| 2025 | 362,500 | 748,256 | — | 14,333 | 1,125,089 |
| 2024 | 650,000 | 1,125,021 | — | 2,465 | 1,777,486 |

***Relevant Non-Parties***

**Easwaran Sundaram**

74. Easwaran Sundaram ("Sundaram") has served as a director of Krispy Kreme since June 2025 and is currently a member of the Audit Committee and the CNG Committee.

75. The Company's 2026 Proxy stated, in part, the following about Sundaram:

> **EASWARAN SUNDARAM**
>
> **OPERATING EXECUTIVE, TAILWIND CAPITAL**
>
> **Biographical Information**
> Easwaran Sundaram has served as a member of our Board since June 2025. Mr. Sundaram is currently an Operating Executive at Tailwind Capital, a mid-market private equity firm, and the Founder and a General Partner at Utpata Ventures LLC, an early-stage startup fund with a focus on deep technology, the future of transportation, space, and aerospace investments. Prior to this, Mr. Sundaram

served as the Executive Vice President and Chief Digital & Technology Officer of JetBlue Airways Corporation from 2012 until his retirement in February 2021 where he led the company's transformation from a traditional airline to a travel technology company, and delivered substantial cost savings through technology transformation in flight, crew operations, customer support, and fleet programs. Mr. Sundaram was also a founding member and oversight officer of JetBlue Technology Ventures, a JetBlue Airways subsidiary that incubates, invests in, and partners with startups. Previously, he was Senior Vice President of Global Supply Chain and Chief Information Officer at Pall Corporation where he drove digital transformation and operational synergies. Prior to this, Mr. Sundaram served in a senior supply chain management role at PSS World Medical – McKesson Corporation. Mr. Sundaram is currently a member of the board of directors and audit committee of WESCO International (NYSE: WCC) and, from 2020 to 2025, he served as a member of the board of directors of SolarWinds Corporation until that company became privately held.

**Qualifications**
Mr. Sundaram holds a M.S. in International Transportation Management & Operations Research from State University of New York Maritime College, a Post Baccalaureate Diploma in Logistics Management from the Institute of Rail Management in India, and a B.S. in Chemistry from the Madurai Kamaraj University. We believe that Mr. Sundaram's extensive leadership experience as a technology and transformation executive of a Fortune 500 company and his expertise in digital tools and applications, cybersecurity, and global supply chain management qualifies him to serve on our Board.

76. According to the Proxy Statements filed with the SEC, in fiscal year 2025, as a non-employee director, Sundaram received $167,694 in compensation from the Company.

| Fiscal Year | Fees Earned or Paid in Cash ($) | Cash Retainers Earned ($) | Stock Awards ($) | Equity Grant ($) | Total ($) |
|---|---|---|---|---|---|
| 2025 | | 37,692 | | 130,002 | 167,694 |

***Patrick Grismer***

77. Patrick Grismer ("Grismer") has served as a director of Krispy Kreme since June 2025 and is currently a member of the Audit Committee.

78. The Company's 2026 Proxy stated, in part, the following about Grismer:

**PATRICK GRISMER**

**FORMER EXECUTIVE VICE PRESIDENT AND CHIEF FINANCIAL OFFICER, STARBUCKS COFFEE COMPANY**

**Biographical Information**
Patrick Grismer has served as a member of our Board since June 2025. Mr. Grismer served as Executive Vice President & Chief Financial Officer of Starbucks Coffee Company (NASDAQ: SBUX) from November 2018 to February 2021, and as Special Advisor to the CEO from February 2021 to April 2021. From March 2016 to November 2018, Mr. Grismer served as Executive Vice President & Chief Financial Officer of Hyatt Hotels Corporation (NYSE: H). Prior to that, Mr. Grismer spent nearly 14 years with Yum! Brands, Inc. (NYSE: YUM), a global quick-service restaurant company, in a number of executive roles, including serving as Chief Financial Officer of Yum! Brands, Inc. from May 2012 to February 2016. Prior to that, Mr. Grismer served in various leadership positions at The Walt Disney Company (NYSE: DIS) from 1990 to 2000, including Vice President of Business Planning & Development for The Disneyland Resort and Chief Financial Officer for Disney Vacation Club. Mr. Grismer began his career as a consultant with PricewaterhouseCoopers. Mr. Grismer currently serves as a member of the board of directors and audit and risk management committee of Deckers Outdoor Corporation (NYSE: DECK) since September 2025. He served as a member of the board of directors of Panera Brands from September 2022 to April 2025, including serving as board chair from June 2024 to April 2025 and audit committee chair from July 2023 to November 2024.

**Qualifications**
Mr. Grismer holds a B.S. in Accounting from the University of Southern California Marshall School of Business and an M.B.A. from Northwestern University Kellogg School of Management. Mr. Grismer's extensive leadership experience with global consumer-oriented companies, his deep understanding of the global retail food industry and his technical expertise in matters of corporate finance, financial reporting, and internal controls qualifies him to serve on our Board.

79. According to the Proxy Statements filed with the SEC, in fiscal year 2025, as a non-employee director, Grismer received $170,373 in compensation from the Company.

| Fiscal Year | Cash Retainers Earned ($) | Equity Grant ($) | Total ($) |
|---|---|---|---|
| 2025 | 40,371 | 130,002 | 170,373 |

**Bernardo Hees**

80. Bernardo Hees ("Hees") has served as a director of Krispy Kreme since June 2025 and has served as Chair of the Strategy and Operating Committee since July 2025.

81. The Company's 2026 Proxy stated, in part, the following about Hees:

**BERNARDO HEES**

**OPERATING PARTNER, THE CRANEMERE HOLDINGS GROUP**

**Biographical Information**
Bernardo Hees has served as a member of our Board since June 2025. Mr. Hees is currently an Operating Partner at The Cranemere Holdings Group, a long-term industrial holdings firm, since March 2024, and a Senior Advisor to JAB with respect to its investments in the Company since April 2025. Prior to this, he has held numerous leadership roles at global companies, serving as Executive Chairman of Avis Budget Group, Inc. (NASDAQ: CAR), a global mobility company, from 2020 until 2024, Chief Executive Officer of The Kraft Heinz Company from 2015 until 2019, and as Chief Executive Officer of H.J. Heinz Holding Corporation from 2013 until 2015. From 2010 to 2013, Mr. Hees served as Chief Executive Officer of Burger King Worldwide, Inc. and its predecessor entity. From 2005 to 2010, Mr. Hees served as Chief Executive Officer of América Latina Logistica (ALL Logistics), a Brazilian logistics company. Mr. Hees was a Partner at 3G Capital, a global investment firm, from 2010 until 2019. He currently serves as a member of the board of directors of Avis Budget Group, Inc. (NASDAQ: CAR) and, from 2019 to 2025, he served as a member of the board of directors of Bunge Global SA (NYSE: BG), a global agribusiness and food company.

**Qualifications**
Mr. Hees holds a B.A. in Economics from the Pontifical Catholic University of Rio de Janeiro/Brazil and an M.B.A. from Warwick Business School in the United Kingdom. He also completed the Owners/President Management program at the Harvard Business School. Mr. Hees is a highly accomplished global executive with more than 25 years of leadership experience across the consumer, logistics, and food sectors. Mr. Hees' global executive experience, including as a former Chief Executive Officer of large international consumer products companies, his public company board experience, and his experience as a former partner of a global investment firm qualifies him to serve on our Board.

82. According to the Proxy Statements filed with the SEC, in fiscal year 2025, as a non-employee director, Hees received $322,695 in compensation from the Company.

| Fiscal Year | Cash Retainers Earned ($) | Equity Grant ($) | Total ($) |
|---|---|---|---|
| 2025 | 72,692 | 250,003 | 322,695 |

83. As of April 7, 2026, Hees beneficially owned 1,311,760 shares of Krispy Kreme common stock which was valued at approximately $4,355,043.20.

**David Shear**

84. David Shear ("Shear") has served as a director of Krispy Kreme since April 2026.

**Melissa Werneck**

85. Melissa Werneck ("Werneck") has served as a director of Krispy Kreme since April 2026 and is currently the Chair of the CNG Committee and a member of the Strategy and Operating Committee.

86. Defendants Charlesworth, Andrada, Bell, Capel, Deno, Goudet, Michaels, Pleuhs, Roberts, Telfer, and Weese are herein referred to as the "Director Defendants." Defendants Charlesworth and Ashukian are herein referred to as the "Officer Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

87. By reason of their positions as officers, directors, and/or fiduciaries of Krispy Kreme, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Krispy Kreme and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care.

88. The Individual Defendants were and are required to use their utmost ability to control and manage Krispy Kreme in a fair, just, honest, and equitable manner.

89. The Individual Defendants were and are required to act in furtherance of the best interests of Krispy Kreme and its shareholders to benefit all shareholders equitably.

90. Each director and officer of the Company owes Krispy Kreme and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

91. As fiduciaries of Krispy Kreme, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

92. The officers and directors of Krispy Kreme were and are required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

93. Each Individual Defendant under their position as officers and directors of Krispy Kreme owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company.

94. As Krispy Kreme's directors and officers, the Individual Defendants knowingly acted with reckless disregard for their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

95. The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, inter alia, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospects. Moreover, as senior officers of a publicly traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, the Individual Defendants had a duty to act in the best interest of the Company.

96. As fiduciaries, the Individual Defendants had a duty to disclose in the Company's regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

97. The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things, the Individual Defendants were required to:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Krispy Kreme's Code of Business Conduct and Ethics and other internal guidelines;

(b) conduct the affairs of the Company in an efficient, businesslike manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Krispy Kreme conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a reasonable inquiry in connection with and in addition to that, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic, accurate records and reports of the business and internal affairs of Krispy Kreme and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Krispy Kreme's operations would comply with all laws and Krispy Kreme's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the Company's officers' and employees' public statements and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or additional financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

98. Each of the Individual Defendants further owed Krispy Kreme and its shareholders the duty of loyalty requiring that each favor Krispy Kreme's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

99. At all times relevant hereto, the Individual Defendants were the agents of each other and Krispy Kreme and were, at all times, acting within the course and scope of such agency.

100. The Individual Defendants had access to adverse, non-public information about the Company because of their advisory, executive, managerial, and directorial position with Krispy Kreme.

101. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Krispy Kreme.

## CODE OF BUSINESS CONDUCT AND ETHICS

102. Krispy Kreme's Code of Conduct specifies that the Code "applies to everyone at Krispy Kreme (our 'Krispy Kremers'), from the Board of Directors to all officers and employees of Krispy Kreme companies, subsidiaries, and equity partners."

103. The Code of Conduct also states, in pertinent part, the following:

**A NOTE FROM OUR CEO**

> Our vision is to become the world's most loved sweet treat brand, and our strategy is clear: Make our fresh doughnuts available in more places and keep reminding people of the joy that is Krispy Kreme, not just to eat but to share and give to others. We are continuing to build a business worthy of our brand's potential and to grow profitably whilst striving to provide doughnuts that are fresh and awesome everywhere, all the time.
>
> To achieve this, it is important that we try our best to always do the right thing. It is up to each of us individually to protect the company's reputation, act with honesty and integrity, and ensure that every location that bears our name is a sweet place to work. Our approach to compliance comes down to two key ingredients: Uncompromising Integrity and Respect for the Individual.
>
> This Code of Conduct reflects these values and demonstrates our commitment to integrity and to treating each other respectfully every day. Just as I have, please read the policy, and commit to it.
>
> Sincerely,
>
> Josh Charlesworth
> President & Chief Executive Officer

**INTRODUCTION**

> At Krispy Kreme (the "Company"), we strive to create experiences that inspire customer wonder and joy. We are committed to doing so with uncompromising integrity and respect for individuals. These two principles are the cornerstones of our compliance practices. This Code of Conduct (the "Code") provides a framework for promoting the safe and efficient operation of our business. It is a living document that will continue to grow and evolve alongside our Company. Please refer to our Employee Handbook ("Handbook") for more detailed guidance on the issues discussed in this Code.
>
> Please read our Code, follow it, and encourage fellow Krispy Kremers to do

the same. Our Code covers a wide range of business practices and procedures, but it does not cover every issue that may arise. The absence of any particular conduct or activity from the Code should not be interpreted to suggest or imply that the conduct or activity is allowed. If you ever have a question, or a concern about whether you are in compliance with the Code, or that a coworker isn't honoring the principles outlined here, speak up. We want to hear from you. You can review the Employee Handbook, talk to your supervisor or Human Resources ("HR"), or submit your questions or concerns through our EthicsPoint hotline either by phone or online. (see details below).

**DOES OUR CODE APPLY TO YOU?**

Our Code applies to everyone at Krispy Kreme (our "Krispy Kremers"), from the Board of Directors to all officers and employees of Krispy Kreme companies, subsidiaries, and equity partners. As a Krispy Kremer, we expect you to read, understand, and follow our Code. Krispy Kreme will enforce this Code, and correct unacceptable behaviors, in a reasonable and equitable manner that not only respects the Company's business interest, but also the interests and concerns of our employees.

**RESPONSIBILITY TO OUR INVESTORS**

We are committed to the utmost integrity in our accounting and financial reporting and the manner in which we engage with the investment community, while maintaining a steadfast focus on upholding good stewardship of company resources.

We are committed to providing full, fair, accurate, timely, and understandable disclosure of relevant information to our investors and the Securities and Exchange Commission. We have legal obligations, and it's important to remember that fraudulent or misleading reporting or improper transactions can result in civil or criminal penalties to the individuals involved and to the Company.

All transactions must be properly approved and accurately reflected on our books and records, accounting, and financial reporting. Estimates and guidance on future performance, though subject to many uncertainties and risks, should be based on good faith views at the time made. You should also report any error, deficiency or non-compliance with our internal accounting controls.

Our responsibility to be accurate, honest, and complete also applies to day-today recordkeeping, such as time clock entries and expense requests. It is never acceptable to take any part, no matter how small your role, in any activity that involves theft, fraud, embezzlement, or misappropriation of company property. Your participation in fraud occurs any time you help

conceal, alter, falsify, or omit information in records either for your benefit or at the direction of others. This includes following the rules of reimbursement for business-related travel and expenses.

**COMPLIANCE WITH LAWS, RULES & REGULATIONS**

Obeying the law, both in letter and in spirit, is one of the foundations on which our ethical policies are built. All Krispy Kremers must respect and obey all applicable governmental laws, rules and regulations.

**Proceed with CAUTION.** Most people know right from wrong. But they can still make unethical choices because they rationalize their behavior. Justifying a decision with any of the following reasons is a warning sign that you should **discuss your options with your supervisor or HR before taking action.**

- Everybody does it
- No one will find out
- No one will get hurt
- I don't have a choice
- I earned it

* * *

**RECORDKEEPING**

In order for us to make responsible business decisions and get an honest account of our performance, we must maintain accurate and appropriately detailed company records. Krispy Kreme manages and maintains records in a manner that complies with all applicable laws and our Records Retention Policy. If you are unsure about the appropriate retention period for a specific record, seek guidance from Human Resources. From time to time, our Legal Department may instruct us to retain certain records related to litigations, audits, and investigations for longer periods than those required by our Records Retention Policy. Each employee is required to follow those instructions unless and until you are told otherwise.

* * *

**PROTECTING OUR ASSETS**

Our success relies not only on selling the world's best doughnuts, but on our ability to conserve and protect company assets – that is, things of value that belong to Krispy Kreme, like our facilities, equipment, networks, trade secrets (including any proprietary formulas or ingredients) and intellectual property (including our logos, copyrights and trademarks). Treat Krispy Kreme assets with care and protect them from waste, loss, damage and abuse. Use our assets responsibly and for legitimate business purposes only.

If you have questions about whether a certain use of company assets is appropriate, or you suspect fraud or theft of company assets, contact your supervisor or HR.

We use networks and computers appropriately.

We must use our computers (including, laptops, smartphones, and tablets) and network systems appropriately at all times. This means we must take care to compose all emails, text messages, and other electronic communications in the same professional manner as our other written correspondence. Be aware that Krispy Kreme maintains the right to access, review, and monitor any information transmitted, received, or stored using company-provided technologies and personal electronic devices used to perform work for the Company, with or without an employee's or third party's knowledge, consent, or approval. Occasional personal use of our computer equipment and networks may be permitted, but this use should never interfere with your work responsibilities. You should have no expectation of privacy when using company resources or when using your personal device for Company business. Remember our values when using these resources, and never use them to transmit offensive, inappropriate, harassing, or unprofessional messages. See our Global Acceptable Use Policy for additional information.

* * *

**DOING WHAT'S RIGHT**

We create a stronger and better place to work when we come together as one company, with one company culture, and one set of standards.

We are responsible for our own actions, and we are responsible to each other. Ethical decision-making is about choices. But ethical choices are not always obvious. When faced with an ethical choice, it might be helpful to ask and answer the following questions:

- Will my action or inaction threaten anyone's health or safety?
- Will my action or inaction violate any applicable law, rule, or regulation, or any company policies or procedures?
- Would I feel proud if the full details were disclosed to my fellow employees, friends, and family?
- Would I want to read about this in the media?
- How would I feel if I were on the receiving end of my actions?

Violations of this Code, our policies, or the law may result in disciplinary action, up to and including termination of employment. In the case a violation of law, civil and/ or criminal penalties may be imposed by a governmental agency or a court.

This Code is not a contract. It does not convey or modify any employment rights or relationships, whether at will or governed by a contract.

Krispy Kreme reserves the right to amend or alter this Code at any time and for any reason.

* * *

**KRISPY KREME INC. CORPORATE GOVERNANCE PRINCIPLES**

104. In addition to those duties enumerated above, under the Company's Corporate Governance Principles (the "Principles"), the Individual Defendants owed specific additional duties to Krispy Kreme.

105. The Principles were adopted "as a framework for the governance of the Company" and state, in pertinent part:

1. **ROLE AND COMPOSITION OF THE BOARD OF DIRECTORS**

***Role of the Board***

The Board, which is elected by the stockholders, is the ultimate decision-making body of the Company, except with respect to those matters reserved for the stockholders. Directors' basic responsibility is to exercise their business judgment to act in what they reasonably believe to be the best interests of the Company and its stockholders. The Board selects, advises, and monitors the performance of the senior management team, which is responsible for operating the Company's business. Consistent with the oversight function of the Board, the Board's core responsibilities include:

- Assessing the performance of the Chief Executive Officer (the "CEO") and other senior management and setting their compensation;
- Planning for CEO and senior management succession and overseeing senior management development;
- Reviewing the Company's strategies and monitoring their implementation and results;
- Overseeing the integrity of the Company's financial statements and the Company's financial reporting process;
- Overseeing the Company's processes for assessing and managing risk;
- Ensuring the Company operates ethically, and complies with laws, regulations, and internal policies;
- Overseeing the Company's environmental sustainability and social responsibility strategies and commitments;

- Determining the appropriate size, structure, and composition of the board, and nominating the Company's director candidates and appointing committee members; and
- Providing advice and counsel to management regarding significant issues facing the Company and reviewing and approving significant corporate actions, including mergers, acquisitions, or divestitures.

* * *

**<u>AUDIT AND FINANCE COMMITTEE CHARTER</u>**

106. In addition to the duties above, under the Company's Audit Committee Charter, as members of the Audit Committee during the Relevant Period, Defendants Deno (Chair), Michaels, Pleuhs, and Telfer (collectively, the "Audit Committee Defendants") owed specific additional duties to Krispy Kreme. Pursuant to the Charter, the purpose of the Audit Committee is to oversee:

- the integrity of the Company's financial reporting process and systems of internal controls, including the integrity of the Company's financial statements;
- compliance with the Company's Code of Conduct and laws and regulations; and
- the independence, qualifications and performance of the Company's independent registered public accounting firm (the "independent auditors") and the internal audit department.

107. The Audit Committee Charter further states, in pertinent part, the following:

**<u>DUTIES AND RESPONSIBILITIES</u>**

* * *

6. **Financial Statements.** Meet to review the annual and quarterly financial statements and discuss them with management and the independent auditors, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." These discussions shall include the matters required to be discussed under applicable rules of the Public Company Accounting Oversight Board and the SEC, and other such inquiries as the Committee or the independent auditors shall deem appropriate. Based on such review and discussion, the Committee shall (a) approve the inclusion of the Company's unaudited financial statements in the quarterly report on Form 10-Q and (b) recommend to the Board whether the Company's audited financial statements should be included in the annual report on Form 10-K.

The financial statement review will include, as needed, a review of analyses

prepared by management setting forth significant issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements, any regulatory disclosures required by the SEC and other regulatory bodies (e.g., environmental, social, and governance matters), and a review of the effect of regulatory and accounting initiatives, as well as off-balance sheet structures on the financial statements of the Company.

**7. Earnings Releases.** Review and discuss earnings to be issued in the Company's press releases, and periodically review the Company's corporate practices with respect to earnings press releases and financial information and earnings guidance provided to analysts and ratings agencies.

**8. Plan and Results of Audit.** Discuss with the auditors the nature and rigor of the audit process, receive and review audit reports, receive the recommendation of management as to the fee to be paid to the independent auditors, and provide the independent auditors full access to the Committee (and the Board) to report on any and all appropriate matters. The Committee also shall review and discuss with management and the independent auditors the results of the annual audit, any audit problems or difficulties, and management's response prior to the filing of the annual report on Form 10-K.

**9. Internal Audit.** Oversee internal audit activities, including discussing with management and the internal auditors the internal audit function's organization, objectivity, responsibilities, plans, results, budget, and staffing. This includes (a) a review of regular internal reports to management (or summaries thereof) prepared by the internal audit function, as well as management's response; (b) reviewing and advising on the selection and removal of the internal audit director; and (c) an annual review of recommended changes (if any) to the internal audit charter.

**10. Disclosure Controls and Procedures.** Periodically review the adequacy and effectiveness of the Company's disclosure controls and procedures to ensure that policies are in place to ensure the accuracy of required and voluntary disclosures.

**11. Internal Controls.** Discuss with management, the internal auditors and the independent auditors the quality and adequacy of and compliance with the Company's internal controls, including any material weaknesses, significant deficiencies and significant changes in internal controls. Areas of discussion shall include (a) the reliability of financial reporting; (b) the compliance with applicable codes, policies, laws, and regulations; (c) the preservation of the Company's assets; (d) any special steps adopted in light of material control deficiencies; and (e) the adequacy of disclosures about

changes in internal control over financial reporting.

The Committee will review any significant matters and regulatory concerns and any fraud involving management or other employees who have a significant role in the Company's internal controls. The Committee also will review internal audit plans in significant compliance areas.

**12. Financial Condition**. Review periodically the Company's financial condition and financing plans, including debt covenant compliance, proposed significant borrowings, and sources and uses of cash.

* * *

**16. Audit Committee Report.** Oversee the preparation of the report required by the rules of the SEC to be included in the Company's annual proxy statement.

**17. Legal Matters.** Periodically discuss with management and/or the Chief Legal Officer any legal matters (including the status of pending litigation) that may have a material impact on the Company's financial statements, and any significant reports or inquiries from regulatory or governmental agencies.

**18. Ethical Environment.** Consult with management on the establishment and maintenance of an environment that promotes ethical behavior, including the establishment, communication, and enforcement of policies or codes of conduct to guard against dishonest, unethical, or illegal activities.

**19. Procedures for Complaints.** Establish and oversee procedures for the receipt, retention, and treatment of complaints regarding accounting, internal accounting controls, auditing, or federal securities law matters, including procedures for confidential, anonymous submissions by company employees regarding questionable accounting, auditing, or federal securities law matters.

**20. Compliance Program.** At least annually, review the Company's Compliance Program and management's system to monitor compliance with the overall program. Meet, at least annually, to review the implementation and effectiveness of the Company's compliance program with the Chief Legal Officer, who shall have the authority to communicate directly to the Committee, promptly, about actual and alleged violations of law or the Code of Conduct, including any matters involving criminal or potential criminal conduct. Review on a quarterly basis a report from the Chief Legal Officer regarding the status of any reports of misconduct.

**21. Oversight of Executive Officers and Directors and Conflicts of Interest.** Periodically review the Company's policy with respect to conflicts of interest and compliance with the policy. The Committee will

> review compliance with Company policies and procedures with respect to executive officers' expense accounts and perquisites, including their use of corporate assets, and consider the results of any review of these areas by the internal or independent auditors. The Committee will review significant questionable payments, if any.
>
> **22. Risk Management.** Review and discuss the Company's practices with respect to risk assessment and risk management, and oversee and evaluate the Company's risk management policies in light of the Company's business strategy, capital strength, and overall risk tolerance. The Committee also will evaluate on a periodic basis the Company's investment and derivatives risk management policies, including the internal system to review operational risks, procedures for derivatives investment and trading, and safeguards to ensure compliance with procedures.
>
> **23. Tax Strategies.** Periodically review the Company's tax strategies and any significant pending audits or assessments.
>
> **24. Finance Function.** Review, with management, the Company's finance function, including its resources, organization and quality of personnel. Review with the independent auditors, the internal audit function, and management, the extent to which changes or improvements in financial or accounting practices have been implemented.
>
> * * *
>
> **28. Committee Evaluation.** Evaluate the Committee's performance, assess the adequacy of this Committee Charter on an annual basis, and recommend changes to the Committee or the Charter to the Board as appropriate.

108. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Krispy Kreme, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal action. As a result, and in addition to the damages the Company has already incurred, Krispy Kreme has needlessly expended and will continue to needlessly expend, significant sums of money.

## <u>CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION</u>

109. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

110. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

111. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in deceptive marketing, engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. During the Relevant Period, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did engage in deceptive marketing. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Each of the Individual Defendants described herein was a direct, necessary, and substantial participant in the common enterprise, and/or common course of conduct complained of herein because the action described herein occurred under the authority and approval of the Board.

112. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of wrongdoing.

113. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Krispy Kreme and was at all times acting within the course and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

### The Company

114. Krispy Kreme is a well-known doughnut brand that originally became a public company in 2000, but was taken private by JAB Holdings in 2016. JAB Holdings re-listed Krispy Kreme on public markets again in 2021.

115. After its 2021 initial public offering ("IPO"), Krispy Kreme faced losses and a substantial debt load. In addressing these challenges, the Company reassured investors that "far and away" the primary reason consumers did not purchase its doughnuts was simply "lack of access." Historically, Krispy Kreme had placed greater emphasis on its "Hot Light Theater Shops," retail locations that featured an on-site doughnut production line visible to customers, allowing customers to watch fresh doughnuts being made while also functioning as local production facilities for distributing doughnuts to other points of access throughout the Company's network. Seeking to address the capital-intensive nature of that business model, Krispy Kreme adopted a "hub and spoke" approach in 2016.

116. Through its hub-and-spoke structure, Krispy Kreme centralized doughnut production at facilities designated as "hubs," which consisted of both Hot Light Theater Shops and "Doughnut Factories" (production facilities that are not accessible to customers). The Company then transported doughnuts produced at these hubs to a network of "spokes." Those distribution points included Krispy Kreme's own "Fresh Shops" (Krispy Kreme retail locations that do not include production facilities), as well as various "Delivered Fresh Daily" locations, referred to as "DFD Doors," including grocery stores, convenience stores, and fast-food restaurants. Following its return to the public markets, Krispy Kreme increasingly expanded the DFD portion of its business, and by 2023, the Company had grown its network to approximately 6,000 U.S. customer points of access and approximately 12,000 global customer points of access.

117. Despite implementation of the new business strategy, Krispy Kreme continued to struggle. FE 1, a former Senior Director of Sourcing for International Business, who was employed by Krispy Kreme from March 2022 through January 2025[3], explained that "the financial reporting was coming out and they needed something."

118. Beginning on October 18, 2022, Krispy Kreme conducted a "small operations test" involving doughnuts "delivered fresh daily" to nine McDonald's locations in the Louisville, Kentucky area. On February 27, 2023, the program expanded to 160 McDonald's locations in the Louisville-Lexington, Kentucky area to assess consumer demand and the Company's ability to distribute fresh doughnuts at scale.

---

[3] Testimony from certain former employees is drawn from allegations in the Securities Class Action. Former Krispy Kreme employees as "FE __," using "they/them" pronouns. FE 1's employment ended in January 2025 as part of "massive layoffs after the McDonald's deal fell through."

119. Seeking to reverse the Company's declining business, FE 2[4], a former Vice President of Investor Relations, stated that Defendants pushed the expansion as a means of demonstrating a potential turnaround. FE 3,[5] a former Senior Manager, Field Training, who participated in the McDonald's rollout, similarly explained that the Company needed to improve sales because, in 2024, "people weren't spending and our in-store sales were not the best."

120. To expand access to its products, Krispy Kreme sought to get "doughnuts to where customers are," with broader availability expected to increase sales. That strategy, however, depended on the Company's ability to deliver edible doughnuts to additional locations without impairing profitability. Krispy Kreme assured investors that any nationwide expansion of the test program would proceed only if those logistical demands could be met profitably. At the December 5, 2023 Morgan Stanley Global Consumer & Retail Conference, Defendant Charlesworth stated that the Company had performed "a lot of detailed work" regarding a potential McDonald's expansion and expected the associated costs to remain modest. Charlesworth further represented that Krispy Kreme could service "just under half" of McDonald's locations, approximately 6,000 new doors, through its "existing capacity," with little more required than "just [] trucks and drivers."

121. Through its March 26, 2024 announcement, the Company announced a partnership with McDonald's under which Krispy Kreme doughnuts would be sold at McDonald's locations

---

[4] From August 2023 through March 2024, FE 2 served as Vice President of Investor Relations, reported to Defendant Ashukian, and worked on the March 26, 2024 press release announcing the McDonald's expansion.

[5] FE 3 served as a Senior Manager, Field Training, in the U.S. and worked at Krispy Kreme from February 2021 through March 2025. FE 3 was added to the McDonald's rollout team in the summer of 2023, before the expansion was finalized, reported to the Vice President of Human Resources, James Dunworth, and sat in on many meetings with Amy Hine, the Director of Field Operations.

nationwide. During the Relevant Period, the Company repeatedly represented to investors that the expansion was proceeding according to plan, that the associated costs were not prohibitive, and that the expansion was, overall, a great success. Investors were unaware, however, that the McDonald's partnership was doomed from the outset. Defendants had failed to adequately investigate whether a nationwide expansion was viable, had not sufficiently prepared the Company's infrastructure and facilities to support the expansion, and had disregarded the extent of the costs required to undertake it.

**Failure to Adequately Assess the Expansion's Viability**

122. Despite the absence of adequate due diligence concerning the Company's ability to perform and the partnership's profitability, Krispy Kreme approved the McDonald's partnership. FE 1 reported that it was widely understood within Krispy Kreme that the "deal would not last because the due diligence was not properly done." FE 4,[6] a former Krispy Kreme Senior Director in the McDonald's Business Unit, further explained that the Company's rush to expand the McDonald's partnership nationwide resulted in fatal flaws because Krispy Kreme lacked anyone advising it about what a McDonald's buildout actually entailed, what McDonald's expected from its suppliers, how McDonald's franchisees ordered and managed inventory, or how McDonald's would advertise non-McDonald's products.

123. Although Krispy Kreme represented that the Kentucky test programs showed demand "exceeded expectations" and would allow for "profitable US expansion," the Company did not have data supporting those claims. The test programs were structured in a manner that prevented them from determining scalability or profitability. FE 3 explained that McDonald's

[6] FE 4 worked at Krispy Kreme from November 2024 to June 2025 and claimed they were hired to manage the McDonald's partnership based on their experience working with McDonald's suppliers.

primary goal during the test program was to ensure zero waste, rather than assess demand. During a seven-hour delivery ride-along in Lexington, Kentucky, FE 3 observed the driver deliver to only eight McDonald's locations and supply fewer than 200 total doughnuts because that "was all McDonald's ordered." McDonald's managers told FE 3 that the doughnuts would sell out, but McDonald's refused to increase its orders to avoid waste. If sales declined even slightly, McDonald's reduced its orders; increased sales, however, did not result in additional supply because McDonald's sought to avoid being left with large quantities of unsellable doughnuts. As FE 3 explained, because the locations were stocked with only minimal quantities, the test program never evaluated whether greater volumes of doughnuts would sell and therefore did not actually measure demand.

124. Krispy Kreme was aware of these limitations, according to FE 3, even as the Company spent "all this money but only delivering a couple of trays of doughnuts." FE 3 explained: "do the math, 200 doughnuts is not going to pay for a driver at $18.00 an hour." FE 9[7], a former Executive Vice President and Chief Global Supply Chain Officer, similarly stated that the Kentucky test results provided no "justification" for a larger expansion and claimed that management disregarded the fact that McDonald's reduced orders "almost from day one."

125. Beyond the Kentucky test program, FE 4 reported that the same ordering pattern continued during the nationwide rollout. Krispy Kreme and McDonald's used a third-party consultant to establish initial doughnut quantities, which remained "locked" for the first few weeks before McDonald's could adjust its orders. FE 4 recalled that orders plummeted once the lock-up

---

[7] FE 9 served as Executive Vice President – Chief Global Supply Chain Officer from July 2021 through January 2025.

period expired, just as they had in Kentucky. FE 3, FE 7[8], a Krispy Kreme General Manager in the Grand Rapids, Michigan area from June 2018 through August 2025, and FE 8, a Customer Logistic Manager at a Chicago-area Krispy Kreme from May 2024 through October 2025, confirmed the same pattern. FE 11, an Implementation Consultant who worked on the McDonald's partnership from June 2024 through June 2025, likewise stated that McDonald's orders declined with every launch, while FE 6[9], a Krispy Kreme data analyst, recalled that the reduction in doughnut orders was apparent by autumn 2024.

**Disregard of Significant Partnership Costs**

126. Despite the Company's repeated representations that its existing infrastructure could support the nationwide expansion and that the rollout remained "on track," Krispy Kreme's operations could not be scaled to serve hundreds, much less thousands, of additional locations. Making the expansion successful would have required prohibitively expensive expenditures. FE 5[10], a former Implementation Consultant hired specifically to work on the nationwide expansion, explained that the McDonald's partnership was intended to save the Company, "but Krispy Kreme just wasn't ready," resulting in the Company "sign[] up for something that was unrealistic."

127. Before the McDonald's partnership was announced in March 2024, multiple former employees stated that Defendants knew the expansion would significantly increase costs because Director of Field Operations Amy Hine had presented those costs to Defendants during the summer

---

[8] FE 7 oversaw store openings and McDonald's rollouts at numerous Company locations, reported to Brendan Wolmak, and worked directly with Amy Hine, Director of Field Operations, on store rollouts.

[9] FE 6 served as a Data Analyst from January 2024 through July 2025, reported to Amy Hine, and monitored employees through cameras inside the shops, providing firsthand knowledge of conditions in the production facilities.

[10] FE 5 served as an Implementation Consultant from June 2024 to May 2025, met regularly with Amy Hine, and reported to Keith Katz, both of whom oversaw the McDonald's expansion.

of 2023 through a project known as "Project Ray." FE 3 and FE 6 stated that Ms. Hine's comprehensive analysis of the expansion's costs was presented to the Board and detailed the magnitude of the required investments, the specific rationale for each component, and all relevant cost categories, while raising concerns about the project's cost parameters. FE 3 and FE 6 recalled that "Amy asked the question many, many times: are you sure you want to proceed if it's going to cost this much money up front?" Given the magnitude of the required investment, FE 3 further explained that "there was no way that they were going to get that [money] back anytime soon."

128. FE 6 further reported that cost estimates were regularly provided to senior Company officers, including the Vice President of Operations, the Chief Operating Officer, and Defendant Charlesworth. Because Krispy Kreme was cash poor, FE 6 stated that all expansion-related expenses required review by Ms. Hine, who then obtained approval from either the Vice President of Operations or Charlesworth, as "Hine had meetings with both of them."

129. Despite warnings concerning the prohibitive costs, Defendants continued to push the nationwide McDonald's expansion. FE 1 described the Company's prevailing mantra as "get it done, get it done, get it done." FE 4, who was hired specifically to oversee the McDonald's expansion, confirmed this account, stating that after starting in November 2024, they "realized that everything was already signed" and that the terms were "problematic" and highly unfavorable to Krispy Kreme. Those "problematic" terms imposed no minimum-order requirements on McDonald's, established no parameters for the number of doughnuts McDonald's franchisees could order, and provided no guarantee that McDonald's would include Krispy Kreme in advertisements. The contract also did not specify which party would bear the cost of unsold doughnuts. FE 4 explained that the agreement instead used a complex formula under which Krispy Kreme covered some "waste," while McDonald's would be required to cover more waste as sales

declined. Because McDonald's franchisees did not want to pay for unsold doughnuts, and the contract did not expressly define each party's responsibility, the agreement effectively allowed franchisees to minimize their orders and thereby avoid the issue entirely.

130. Unlike other Krispy Kreme customers, McDonald's was not subject to minimum-order requirements and, as FE 3 explained, "they could order whatever they wanted." Consequently, Krispy Kreme remained obligated to deliver doughnuts even when the orders did not cover costs. FE 3 stated that "with the way that McDonald's could tweak their orders, we would have never made money, ever," yet "somehow in the contract with McDonald's, we allowed that to happen and that's where we got screwed." FE 4 further stated that numerous assumptions underlying the partnership were flawed, including the initial cost estimate of $15 to deliver doughnuts, which was quickly revised to $30.

131. Notwithstanding the partnership terms, FE 1 stated that the costs required to prepare for and implement the nationwide expansion were "dramatic and drastic," even if Krispy Kreme had been protected from absorbing waste and delivery costs. FE 5 and FE 11, consultants responsible for implementing the McDonald's expansion, confirmed the substantial costs involved. FE 5 stated that the team knew from the outset that Krispy Kreme "had bitten off more than they could ever chew" with McDonald's. Similarly, FE 7, a former Krispy Kreme General Manager, stated that they knew "from the beginning" that the partnership would not work for the Company because of the associated costs, explaining that "[w]hat they were asking of the stores was pretty astronomical." FE 7 further stated that the Company was "spending money left and right, doing whatever needed to be done . . . we were over-staffing locations and spending money like crazy on labor."

132. Additional expenses arose from the nature of the McDonald's partnership. FDA requirements mandate multiple checkpoints at food production facilities to prevent hazardous materials from entering production, and a restaurant can become a food production facility when more than half of its sales involve shipping or deliveries to other parties. FE 3 stated that the McDonald's partnership caused numerous Krispy Kreme locations to become food production facilities rather than restaurants, requiring equipment investments to comply with FDA hazardous-material rules. FE 3 reported that Krispy Kreme consequently purchased metal detectors for its U.S. facilities at immense cost, a decision also confirmed by FE 6, FE 4, FE 5, and FE 7. Each detector cost between $40,000 and $65,000, excluding shipping and installation, and each baking facility required two to three units. FE 6, who was responsible for monitoring metal-detector compliance, stated that Krispy Kreme ordered detectors for approximately 120 locations at a cost exceeding $18 million. FE 3 further reported that the metal detectors were no longer used in almost all of its locations after the McDonald's partnership was cancelled.

133. Supporting the nationwide partnership required additional expenditures, including hiring new drivers and purchasing hundreds of additional trucks to accommodate the expanded deliveries. FE 1 further reported that the Company's spending on supplies, including flour and sugar, increased by 30% to 50%.

**Inadequate Infrastructure and Facilities**

134. Regardless of whether Krispy Kreme adequately investigated the feasibility and viability of the nationwide McDonald's expansion and sufficiently budgeted for the increased costs, the condition of the Company's infrastructure and facilities still would have hindered the expansion's success. FE 5 described Krispy Kreme's factory conditions as "disgusting": "rodents, rats, mice, roaches, and no standards of cleanliness," with production lines often full of mold. The

implementation consultants assigned to the expansion were in "complete shock" and reported these conditions to Ms. Hine, who reported directly to Defendant Charlesworth, and Keith Katz, Senior Manager, Operations Market Implementation. FE 5, who prepared Krispy Kreme shops in Illinois, Ohio, New York, Indiana, Kentucky, and West Virginia for the McDonald's partnership, stated that these conditions were pervasive at each shop. FE 5 recalled pleading with Mr. Katz: "Keith send me to a shop that [actually] looks the way it is supposed to look so that I have something to compare these bad ones to." According to FE 5, that never occurred. FE 11, another implementation consultant, likewise reported that many shops were older and contained structural gaps through which rodents could enter. FE 11 further stated that one shop being tested as a production facility for the McDonald's partnership had a full infestation and was shut down for several days for remediation.

135. Consistent with these facility deficiencies, FE 3, a Senior Manager, Field Training responsible for implementing training for the McDonald's expansion, confirmed that many Krispy Kreme facilities were placed on performance improvement plans specifically because of poor food safety records. FE 6, who attended multiple meetings concerning the McDonald's partnership, likewise reported frequent mold, rodents, and other sanitary issues at Krispy Kreme facilities, including facilities they personally visited. FE 8 similarly reported rodents in and around their shop and described the store's overall condition as "really bad."

136. Because the nationwide expansion depended on Krispy Kreme's production facilities satisfying McDonald's standards, the condition of those facilities was critical to the partnership's success. The McDonald's contract required facility audits, and FE 3 stated that McDonald's third-party auditor, McClement, applied standards substantially higher than Krispy Kreme's existing standards, requiring significant expenditures "getting our shops that were

identified to be McDonald's locations, up to a higher standard." These requirements included additional safety documentation, hygiene training, sick policies, personal cleanliness, and cleaning personnel. FE 3 further stated that McClement required Krispy Kreme to purchase numerous machines for testing bacterial swabs, resulting in upfront equipment costs and recurring expenses for disposable swabs costing more than $500 per pack. FE 6 likewise stated that McDonald's "very rigorous audit process" required Krispy Kreme to deploy teams of specialists to the shops to conduct a complete "backhouse reset" and overhaul operations before an audit.

137. Beyond the condition of the facilities themselves, Krispy Kreme's production equipment could not operate at the level required to meet the volume anticipated from the nationwide expansion. FE 3 described the machinery as outdated and stated that, when equipment deteriorated, the Company kept "putting Band-Aids on things," a practice it called "deferred maintenance," resulting in frequent breakdowns and costly repairs. FE 3 further stated that the Company knew "equipment maintenance" would become costly once the expansion began: "When you run a machine that hard, it turns into some pretty big expenses." FE 6 likewise reported that "there were a lot of systems issues, many were too old and not capable of handling the volume Krispy Kreme was doing." According to FE 6, the Company had consistently "put off doing maintenance" with the attitude that "we'll get there when we get there." FE 7 similarly stated that "[t]here was repair and maintenance that hadn't been done in a while." FE 11 described the deferred-maintenance problem as "absolutely" severe and reported that only two U.S.-based employees could perform major production-line repairs, resulting in delays of up to days before repairs could be completed. FE 11 further recalled instances in which shipments could not be made because critical machinery was out of service.

138. Beyond the facilities' physical condition, Krispy Kreme's production operations could not meet the volume required for the nationwide expansion. FE 8 reported that the Company hired employees indiscriminately and failed to adequately train them. FE 5 stated that "half the time [the factories] didn't have a doughnut maker" and that those with doughnut makers produced poor-quality doughnuts. FE 3 oversaw employee training conducted at "lightning speed," while the Company hired costly third parties to assist with training. Although Krispy Kreme budgeted $1 million to rewrite its new-employee training programs to comply with McClement's standards, FE 3 stated that the Company exceeded that amount. When additional employees could not be hired, FE 6 reported that the Company increased overtime pay for existing employees to meet production demands.

139. Preparation time for the nationwide expansion was insufficient. FE 5 stated that implementation consultants were given only fourteen weeks to sanitize facilities and remove mold, repair broken-down machinery, and reorganize stores to accommodate additional supplies. FE 5 further reported that certain facilities required complete renovations to support increased production.

140. Once the nationwide expansion began, the problems arising from Krispy Kreme's inadequate infrastructure and facilities could no longer be remedied. FE 5 attended weekly calls with the other expansion consultants, during which the consultants raised issues concerning disgusting facilities, insufficient infrastructure to produce the required volume of doughnuts, and inadequate staffing. FE 5 characterized the situation as "it was just a complete sh*t show." Ms. Hine, who reported directly to Defendant Charlesworth, and Mr. Katz also attended these calls. Mr. Katz told FE 5 that Krispy Kreme required "another three or four years of preparation" to

resolve the problems and develop the infrastructure necessary for the nationwide expansion to succeed.

141. Separate from production capacity, Krispy Kreme's delivery infrastructure presented additional problems even if its facilities could produce the necessary volume of high-quality doughnuts. New delivery drivers were assigned to McDonald's deliveries without training, knowledge of their routes, or instruction regarding the proper handling or timing of doughnut deliveries. FE 6 explained that certain McDonald's locations imposed tight delivery windows, and deliveries arriving outside those windows would be rejected or returned. FE 4 summarized the problem: "With McDonald's you have to be 100% on time with your deliveries and Krispy Kreme just wasn't there."

142. Driver attendance created additional delivery failures. FE 5 reported that newly hired drivers frequently failed to report for work, resulting in missed deliveries. FE 6 explained that the problem was recurring: "We had to hire backup drivers. Krispy Kreme had to develop all these contingency plans to prepare for people not showing up." As a result, the Company hired additional drivers, offered retention bonuses, and relied on expensive third-party logistics companies.

**Defendants' Knowledge of Partnership Problems**

143. Throughout the Relevant Period, Defendants were aware that the nationwide expansion faced severe challenges that were neither unforeseen setbacks nor minor complications. From the outset, Defendants either knew of or willfully ignored problems affecting the expansion while continuing to assure investors that everything was proceeding as planned. Once the expansion began, the Company had access to sales data and information concerning its performance. As Defendant Charlesworth stated on November 7, 2024: "we can track the

deliveries. We can track any that are unsold. And, indeed, we can see that they clearly sold throughout the day."

144. Senior management at Krispy Kreme had real-time access to the Company's financial and operational data. FE 2 stated: "I know that they could do it [pull the numbers] every single day, and I know from [Defendant Charlesworth's] explanation to me that it was extremely accurate." FE 2 further reported that, during meetings with investors, Charlesworth would "pull his phone out" and show precisely "what came in on what day and what went in and out." According to FE 2, Charlesworth could determine at any given time how many doughnuts were in each shop and monitored the Company's performance "every single day."

145. Through its internal systems, Krispy Kreme continuously tracked McDonald's order information captured through handheld devices used by delivery drivers, which FE 5 stated was automatically entered into the Company's systems and provided real-time visibility into delivery volumes, returns, and sales performance. FE 1 further stated that senior management and executives had access to McDonald's sales and delivery data.

146. Senior management was repeatedly apprised of operational problems affecting the McDonald's expansion. In November 2024, FE 4 raised concerns with their supervisor, Scott Bacco, Krispy Kreme's Chief Commercial Officer, regarding quality and logistical problems and explained that the Company was not prepared for the nationwide expansion. FE 4 also communicated operational concerns to Tom Heinzmann, Vice President of U.S. Operations. These concerns prompted Defendant Charlesworth to meet with McDonald's in Columbus, Ohio. FE 4 attended that meeting, where McDonald's franchisees identified the same problems FE 4 had raised: inconsistent deliveries, unsanitary procedures, and subpar doughnut quality.

**Defendants' False and Misleading Statements**

147. Notwithstanding these conditions, throughout the Relevant Period, Defendants continued to represent to investors that Krispy Kreme could support the McDonald's expansion using "existing capacity," that the Company was "not ramping up CapEx" to fund the expansion, and that the rollout "remain[ed] on track to reach about 6,000 [McDonald's] restaurants by year-end."

148. As an example, reporting its first-quarter 2024 financial results on May 9, 2024, the Company issued a press release in which Defendant Charlesworth assured investors that "[w]e'll support much of this nationwide rollout using existing capacity, while adding distribution with other major customers as we grow."

149. Later that same day, the Company held a call with analysts and investors, during which Defendant Charlesworth stated that "[m]uch of the national rollout can happen using existing capacity." When asked about the logistics of delivering a high volume of doughnuts, Charlesworth further stated: "we're focusing our attention in the U.S. on what is a very capital-efficient model and leveraging the excess capacity of the production hubs through these off-premise DFD doors . . . We've got the excess capacity in the U.S."

150. On August 8, 2024, during the Company's conference call with analysts and investors to discuss its second-quarter 2024 financial results, Defendant Charlesworth represented that "the expansion of delivered fresh daily in the U.S. is leveraging an underutilized system, the additional densification of all that distribution means you get flow through to the bottom line. . . ." Charlesworth further stated that "[i]n the early months, nearly all of the expansion is serviced by existing production hubs."

151. At the September 10, 2024 Piper Sandler Growth Frontiers Conference, Defendant Charlesworth similarly represented that the Company could accommodate the expansion "with just our existing production facilities, a lot of them former franchisees, a few years old, heavily underutilized. So, we're able to leverage that to service the demand," and had "a very clear path to support [the McDonald's] expansion." At the same conference, Defendant Ashukian assured investors that the McDonald's expansion would not be overly costly, stating: "We typically spend 6% to 7%, 7% to 8% on CapEx, so we're not ramping up CapEx over the next couple years to fund some of the expansion in the US."

152. On September 30, 2024, the SEC's Division of Corporation Finance wrote to Defendant Ashukian requesting that the Company "disclose the material terms of your Business Relationship Agreement with McDonald's," including "the estimated capital expenditure necessary to meet such obligations." In an October 10, 2024 response letter, Ashukian represented that Krispy Kreme was "not subject to capital expenditure commitments or obligations specific to the relationship with McDonald's. We plan to support much of this expansion using existing capacity, and do not expect a significant increase in capital expenditures as a percentage of revenue in 2024." Ashukian added that while the Company expected "U.S. capital expenditures as a percentage of revenue to increase in fiscal 2025 and 2026 associated with acceleration of the overall U.S. business expansion, these capital expenditures support the overall DFD and retail channels and are not directly attributable to, or required by, this agreement."

153. During a conference call with analysts and investors held on November 7, 2024 to discuss the Company's third-quarter 2024 financial results, Defendant Ashukian responded to an analyst's question about whether the Company's lowered adjusted EBITDA guidance was due to McDonald's-related costs.

154. Defendant Ashukian attributed those costs to the "intentional decision to accelerate" the rollout and characterized the increased costs as a "pull forward versus anything unexpected":

> And maybe I'll start with the revenue kind of point and work back. But our guide of 5% to 7% organic revenue for the year, reflects our confidence in our ability to continue to grow revenue amidst choppiness in traditional retail locations, which in the guide is being offset. So we're seeing some softness in retail by the small contribution of incremental top line due to the accelerated expansion. So we feel good that we can hold the top line. The full year guide on EBITDA was updated to reflect the impact of higher logistics costs in the quarter, our intentional decision to accelerate start-up costs. So it's a pull forward versus anything unexpected and the carve-out of Insomnia, the largest impact being the logistics cost, followed by the start-up investments and then a small amount on the kind of carve-out of Insomnia. As mentioned on the call, I think it's important to note that we are committed to continuing to drive a better business. We believe we'll return to operating leverage in the fourth quarter.

155. On November 8, 2024, Krispy Kreme filed its Form 10-Q for the third quarter of 2024, signed and certified by Defendants Ashukian and Charlesworth, which again represented that "these capital expenditures support the overall DFD and retail channels and are not directly attributable to, or required by, the agreement with McDonald's."

156. Reporting its fourth-quarter and full-year 2024 financial results on February 25, 2025, the Company also issued its guidance for 2025. For the fourth quarter of 2024, Krispy Kreme reported net revenue of $404 million and adjusted EBITDA of $45.9 million. The Company further forecast 2025 revenue of $1.55 billion to $1.65 billion and adjusted EBITDA of $180 million to $200 million.

157. During a conference call held that same day to discuss the Company's financial results, Defendant Charlesworth stated that Krispy Kreme "remain[ed] on track to reach about 6,000 [McDonald's] restaurants by year-end."

158. Addressing the nationwide expansion's performance later in the call, Defendant Charlesworth responded to a question concerning how the rollout compared with expectations by stating that the "rollout is on track":

> Andrew, we started the phased rollout of McDonald's just in October. We're already in actually 2,500 restaurants today. We're launching in New York just today. We expect to be in about 6,000 by the end of the year and 12,000 by the end of 2026. So that rollout is on track.
>
> It's important to understand as well that the phased nationwide rollout of McDonald's is part of a broader strategy to make our fresh doughnuts more accessible, as mentioned earlier, with Walmart, Target, Kroger, Costco and others.
>
> So all that being said, the feedback from McDonald's is very positive; they tell us it's working well. And we're working hard with them to maximize the opportunity, make sure that the launch goes well. And we've seen during the launch phase that with local marketing, the team at McDonald's is able to raise awareness, make sure that people know it's on the menu, driving very strong demand and no visible cannibalization of our other sales channels.

159. During the same call, Defendant Charlesworth reassured investors that the Company was "leverag[ing] existing capacity" and had "increased productivity" at its existing facilities:

> [F]rom an operational point of view, that as we prepare for this nationwide footprint in the US and we expand with the national partners, we're finding more and more ways to leverage our existing capacity, whether it's because we've increased productivity at our existing hubs or we're learning how to get the doughnuts out to the points of access better and better. So there is an opportunity, we think, going forward to invest a little less than we originally expected in the hubs, which means that we'll probably only build about five to seven new hubs this year in the US, which is a little less than we had previously expected, reflecting the ability to leverage that existing capacity better.

160. Appearing on a Yahoo! Finance news program later that same day, February 25, 2025, Defendant Charlesworth responded to a question concerning investor confidence by stating: "as we prepare for this National roll out in the U.S. . . . we're confident for [] the long-term profitable growth." Charlesworth further claimed that "the feedback from McDonald's [] has been [] positive" and that the expansion would reach "6,000 by the end of this year, 12,000 by the end

of next year." He also characterized the McDonald's partnership as "an important program for [] our growth," adding that "the doughnuts [] are fresh, freshly made [] they are delivered daily from our hub and spoke network so [] they're very similar to what you get in a Krispy Kreme store."

161. In its February 27, 2025 Form 10-K for fiscal year 2024 (the "2025 10-K"), the Company characterized its capital expenditures as not specific to McDonald's, stating that "these capital expenditures support the overall DFD and retail channels and are not directly attributable to, or required by, the agreement with McDonald's."

162. The above statements were materially false and misleading, and omitted material facts because: (i) Krispy Kreme could not execute the McDonald's expansion using its existing production and logistics infrastructure, as its production facilities were in poor condition and could not satisfy McDonald's audit standards without costly remediation, and its delivery network lacked the drivers and trucks needed to service McDonald's locations, ultimately forcing the Company to "fully outsource U.S. logistics"; (ii) the McDonald's expansion required substantial upfront costs and capital expenditures specific to the partnership, including metal detectors costing more than $18 million and hundreds of additional delivery trucks, the magnitude of which had been quantified in Amy Hine's comprehensive cost analysis presented to the Board before the March 2024 announcement, and which the Company later confirmed by recording at least $51 million in impairment and termination charges attributable to the termination of its agreement with McDonald's; (iii) by February 2025, the rollout was plagued by inconsistent deliveries, poor product quality, and sharply declining orders, such that Krispy Kreme was not on track to reach approximately 6,000 McDonald's restaurants by year-end, as Defendants, who had real-time access to the Company's sales and delivery data, knew or recklessly disregarded; and (iv) as a

result, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

**The Truth Is Revealed**

163. On May 8, 2025, Krispy Kreme revealed that no additional McDonald's locations had been added since February 25, 2025, while the number of locations selling doughnuts had actually declined. The Company further stated that it did "not expect to launch in any additional restaurants in the second quarter of 2025," and stated that it was "reassessing the deployment schedule together with McDonald's while it works to achieve a profitable business model for all parties."

164. Released on May 8, 2025, the Company's first-quarter 2025 financial results reflected the disastrous impact of the McDonald's partnership. Krispy Kreme reported adjusted EBITDA of $15.9 million for its U.S. segment, representing a 62% decline compared with the first quarter of 2024, which the Company attributed in part to "costs associated with our U.S. nationwide expansion." The Company further disclosed that, rather than continue distributing its doughnuts to its retail partners itself, it would "fully outsource U.S. logistics" in an effort to "simplify [] operations." The Company also withdrew its 2025 financial guidance and announced that it would discontinue its $0.035 per share quarterly dividend, which it had consistently paid since 2021.

165. From May 7 through May 9, 2025, Krispy Kreme's stock price declined 37%, falling from a closing price of $4.33 per share on May 7 to $2.73 per share on May 9.

166. In response to Defendants' pre-May 8, 2025 statements, analysts highlighted that those statements had been false and misleading. Truist questioned management's credibility, stating: "We are shocked by the speed at which the story fell apart. Management provided a

'everything going as planned message' on the 4Q earnings call in early February and at several conferences YTD." Truist further indicated that it had lost its "high conviction in management's previously stated strategy," downgraded its rating from "buy" to "hold," and ceased providing a price target for Krispy Kreme shares.

167. Approximately one month later, on June 24, 2025, the Company announced the termination of the McDonald's partnership, specifically attributing the termination to enormous costs and insufficient demand. In connection with that announcement, Defendant Charlesworth acknowledged that the "efforts to bring our costs in line with unit demand were unsuccessful, making the partnership unsustainable."

168. Reporting its second-quarter 2025 financial results on August 7, 2025, the Company issued a press release stating:

> "Our results for the second quarter primarily reflect the impact of unsustainable operating costs relative to unit demand in the McDonald's USA partnership, which ended July 2, 2025. We are quickly removing our costs related to the McDonald's partnership and growing fresh delivery through profitable, high-volume doors with major customers. We expect to begin recouping profitability in the third quarter."
>
> "Looking ahead, we have implemented a comprehensive turnaround plan aimed at unlocking our two biggest opportunities: profitable U.S. expansion and capital-light international franchise growth. This plan is designed to reduce leverage and deliver sustainable, profitable growth through refranchising, improving returns on capital, expanding margins, and driving sustainable, profitable U.S. growth," said Krispy Kreme CEO Josh Charlesworth.

169. According to the Company's August 7, 2025 press release, during the first half of 2025, Krispy Kreme invested $54.1 million in capital expenditures, "primarily in the U.S. to support previously committed initiatives aimed at bringing doughnuts closer to our consumers through nationwide expansion." The Company further disclosed at least $51 million in asset write-offs, reporting that "Krispy Kreme recorded long-lived asset non-cash impairment charges of $22.1 million and lease impairment and termination costs of $28.9 million," specifically

attributable to the "termination of the Agreement with McDonald's USA." The $51 million was material to Krispy Kreme, representing more than 45% of the Company's $112 million in U.S. adjusted EBITDA for fiscal year 2024.

170. Further, termination of the McDonald's partnership resulted in a $356 million goodwill impairment charge, more than $270 million of which related to the U.S. segment, reducing that segment's goodwill value by more than 40%. The Company acknowledged that the impairments were "impacted" "by the termination of the agreement with McDonald's USA."

**Board Complicity in the Misconduct**

171. Throughout the Relevant Period, the Board remained informed regarding the Company's financial condition. FE 3 and FE 6 stated that, before the McDonald's partnership was publicly announced, the Board received a comprehensive analysis detailing the costs associated with the nationwide expansion. Despite the Board's knowledge, the false and misleading statements and misconduct detailed above demonstrate that the Board was complicit in permitting the misconduct to occur.

172. Because the Officer Defendants served as Company officers, they were obligated to provide the Board with relevant information that could affect its decision-making and had access to real-time data concerning the McDonald's partnership and nationwide expansion. During the Company's November 7, 2024 conference call with analysts and investors, Defendant Ashukian stated, "we're meeting daily as we execute the rollout of McDonald's and start to expand in different cities, just to take the learnings, as [Defendant Charlesworth] kind of mentioned, and applying course correct as we go. So we feel pretty good that we're making the right choices, trade-offs. We have an ecosystem in place where we're managing issues real time and making choices where we need to be to make sure that we're seeing the flow-through that we need to." On

the same call, Charlesworth stated, "we can track the deliveries. We can track any that are unsold. And, indeed, we can see that they clearly sold throughout the day."

173. Former employees likewise stated that the Officer Defendants had access to information concerning the performance of the nationwide partnership. FE 2 explained, "I know that they could do it [pull the numbers] every single day, and I know from [Defendant Charlesworth's] explanation to me that it was extremely accurate." FE 2 further stated that Charlesworth had detailed sales data available on his phone and monitored the Company's performance "every single day."

174. Both FE 3 and FE 6 reported that Defendant Charlesworth received Amy Hine's comprehensive analysis of the McDonald's expansion, including its costs, and knew that Ms. Hine "asked the question many, many times: are you sure you want to proceed if it's going to cost this much money up front?" FE 6 further stated that Ms. Hine regularly met with Charlesworth regarding approval of expansion expenses.

175. Because the Officer Defendants had a duty to keep the Board informed, they must have provided the Board with information and updates concerning the progress of the nationwide expansion. The Board's failure to prevent the false and misleading statements described above demonstrates its complicity in permitting the misconduct to occur.

**Officer and Director Departures**

176. As a consequence of the failed McDonald's partnership, the Company experienced the departure of officers and directors. On April 23, 2025, Krispy Kreme announced the nomination of a "[r]efreshed [s]late of [d]irectors to [s]upport [the] Company's [t]ransformation." In connection with the announcement, the Company informed investors that the "refreshed Board" would focus on "profitable U.S. expansion."

177. Three days after announcing the termination of the McDonald's partnership, the Company announced on June 27, 2025, that Defendant Ashukian and Chief Growth Officer David Skena had resigned.

**Krispy Kreme's Materially False and Misleading Proxy Statements**

178. Beyond the false and misleading statements described above, the Director Defendants caused the Company to issue additional false and misleading proxy statements during the Relevant Period, including the 2024 Proxy and the 2025 Proxy. Among other matters, the 2024 Proxy and 2025 Proxy solicited stockholder votes to re-elect the Director Defendants to the Board.

179. Before the 2024 Proxy and 2025 Proxy were filed with the SEC and disseminated to Krispy Kreme stockholders, the Director Defendants drafted, approved, reviewed, and/or signed those proxy statements. Plaintiff alleges that the Director Defendants negligently caused the 2024 Proxy and 2025 Proxy to contain materially misleading statements. These allegations are based solely on negligence and do not allege reckless or knowing conduct by or on behalf of the Director Defendants, nor do they sound in fraud. With respect to the 2024 Proxy and 2025 Proxy allegations and related claims, Plaintiff expressly disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness.

180. To support their own re-election to the Board, Defendants Charlesworth, Goudet, Andrada, Bell, Capel, Deno, Michaels, Pleuhs, Roberts, Telfer, and Weese emphasized their purported oversight of the Company in the 2024 Proxy, which stated:

> **The Board's Oversight Responsibilities**
>
> The Company's corporate governance practices and policies ensure substantial independent oversight of management. For instance:
>
> - The Board has a majority of independent and non-employee directors. Six of the 11 director nominees are independent under Nasdaq's listing rules, and 10 of the 11

director nominees are non-employee directors. All of the Company's directors are elected annually.

- The Board's Audit Committee and Remuneration Committee are composed solely of independent directors. Each of the Audit Committee and the Remuneration Committee is composed solely of independent directors. The committees provide independent oversight of management.

- The Board's non-employee directors and independent directors meet regularly in executive session. The non-employee directors meet regularly in executive session without management present and, consistent with Nasdaq listing rules, the independent directors also meet regularly in executive session. These sessions are chaired by the Lead Director.

- The Board reviews and approves the Annual Operating Plan. Management presents the Company's strategy and analysis for the year ahead in alignment with long-term goals and objectives.

*Board Oversight of Risk*

The Board's role in the Company's risk oversight process includes reviewing and discussing with management key areas of material risk to the Company. Annually, the Board reviews and provides input on the Company's enterprise risk management assessment. The Board primarily oversees matters related to strategic, operational, financial, and legal risks. The Audit Committee oversees matters of financial, legal, and compliance risk, including cybersecurity matters. The Remuneration Committee addresses risks related to compensation and other talent-related matters, as well as risks associated with Board independence and governance. Committees report to the full Board regarding their respective considerations and actions.

*Board Oversight of Responsibility*

KKI uses an integrated governance structure to oversee, develop, and execute the Company's Responsibility strategy to act responsibly and be a force for positive impact. The full Board is responsible for oversight, input, and guidance on long-term goals and commitments. The Company's executive leaders help guide and develop these corporate responsibility programs and provide regular updates, at least twice annually, to the Board on progress toward our goals. The Be Sweet Working Group, which includes executive leaders, has direct responsibility for driving the strategy, operational development, and execution of Responsibility initiatives. In 2023, the Company hired three key roles to build our Responsibility engine: Global Sustainability Lead, Global Belonging, Diversity, Equity, Inclusion and Accessibility Lead, and a VP, Global Corporate Communications & Partnership Engagement. Focus areas for the Company in 2023 included, among other things, diversity and inclusion, equity and access, food waste reduction,

community engagement, responsible sourcing, sustainable packaging, energy use, and GHG emissions.

We are committed to transparency and information sharing in corporate responsibility and other Responsibility topics that impact our Company. We have published the Company's first report on Responsibility initiatives in late fiscal year 2023.

181. To support their own re-election to the Board, Defendants Charlesworth, Andrada, Capel, Deno, and Pleuhs emphasized their purported oversight of the Company in the 2025 Proxy, which stated:

**The Board's Oversight Responsibilities**

The Company maintains corporate governance practices and policies designed to facilitate effective oversight by the Board. The Company's Corporate Governance Principles provide that the Board's basic responsibility is to exercise its business judgment to act in what the Board reasonably believes to be the best interests of the Company and its stockholders. The Board selects, advises, and monitors the performance of senior management, which is responsible for operating the Company's business. As part of its oversight function, the Board reviews and approves the Company's annual operating plan and strategy for the year ahead in alignment with long-term goals and objectives.

*Board Oversight of Risk*

The Board is responsible for overseeing the Company's processes for assessing and managing risk. The Board's role in the Company's risk oversight process includes reviewing and discussing with management key areas of material risk to the Company. To administer its risk oversight function, the Board has delegated certain oversight responsibilities to its committees. The Board primarily oversees matters related to legal, compliance, strategic, operational, and financial risks. The Audit and Finance Committee oversees the Company's risk management in light of the Company's business strategy, capital strength, and overall risk tolerance, and oversees cybersecurity risks. The Remuneration and Nomination Committee oversees risks related to remuneration plans, policies, and practices applicable to officers and employees and other talent-related matters, as well as risks associated with Board independence and governance. Committees report to the full Board regarding their respective considerations, actions, and recommendations, as applicable.

*Board Oversight of Responsibility*

The Board oversees the Company's Responsibility strategy, including providing input and guidance on long-term goals and commitments. The Company's

> executive leaders and our Senior Director, Global Responsibility provide regular updates to the Board on progress toward the Company's Responsibility initiatives. The Company maintains a Be Sweet Advisory Committee, which is comprised of cross-functional leaders, to develop and execute the Company's Responsibility initiatives.

182. Through the 2024 Proxy and 2025 Proxy, the Director Defendants represented to stockholders that they understood Company-wide risks, actively oversaw the Company's risks and exposures, and monitored the steps taken to mitigate those exposures. Contrary to those representations, the Director Defendants failed to fulfill their oversight responsibilities by permitting the Company to operate with inadequate internal controls, resulting in the failure to disclose or prevent Defendants from causing the Company to make materially false and misleading statements concerning its operational deficiencies, the costs of executing the McDonald's partnership, and the success of the expansion.

183. Consequently, the Company's stockholders re-elected the Director Defendants to the Board through an uninformed stockholder vote resulting from these misleading statements.

**<u>The Securities Class Action</u>**

184. The Securities Class Action, first filed on May 16, 2025 and consolidated on November 3, 2025, names Krispy Kreme and Defendants Charlesworth and Ashukian as defendants. Plaintiffs alleged that the Company and Charlesworth and Ashukian made false and misleading statements concerning Krispy Kreme's ability to successfully expand the McDonald's partnership nationwide and the costs associated with that expansion. On January 30, 2026, plaintiffs filed an amended complaint, and the defendants subsequently moved to dismiss the amended complaint for failure to state a claim.

185. By Order dated August 26, 2026, the Court granted in part and denied in part the motion to dismiss, sustaining fourteen of the thirty-five challenged statements. The Court concluded that plaintiffs had sufficiently pleaded that statements concerning Krispy Kreme's

ability to execute the McDonald's partnership using existing capacity were false or misleading because of significant deficiencies in the Company's production and distribution capabilities of which Defendants were aware or which they recklessly disregarded. As the Court explained: "these statements cut directly to [the] heart of the McDonald's partnership's value proposition: Krispy Kreme could get more product in front of customers using only existing production and distribution infrastructure, thereby increasing profits without significantly increasing costs. By making these statements, Defendants misled investors about a material aspect of the partnership."

186. Further, the Court concluded that plaintiffs had sufficiently pleaded that statements minimizing the significant upfront costs required by the McDonald's partnership were false or misleading. The Court explained that disclosure of certain anticipated capital expenditures did "not negate their failure to disclose the full scope of these costs and their direct connection to the McDonald's partnership." The Court further relied on Ms. Hine's analysis concerning the costs of implementing the expansion, explaining that a defendant's failure "to share the results of an internal analysis that reaches conclusions at odds with those presented to the investing public" renders its statements actionable.

187. Additionally, the Court concluded that plaintiffs had sufficiently pleaded that Defendants' February 2025 statements concerning the success of the expansion were false and misleading because Defendants were already aware at that time of the expansion's untenable costs and the existing production and logistical deficiencies. As the Court stated:

188. By February 2025, the McDonald's rollout had been underway for nearly five months and plaintiffs' confidential witnesses allege that Defendants were aware of extensive complaints about product quality and data showing poor sales. See (Doc. No. 65 at 39, 69, 81). After nearly five months of the partnership, a reasonable investor would understand Defendants'

claims that Krispy Kreme was still on track to reach 6,000 McDonald's by the end of the year as informed by internal data and specific enough that an investor could rely on them. Viewing the facts in the light most favorable to Plaintiffs and granting them all reasonable inferences fairly deducible therefrom, by February 2025 Defendants knew that the lofty plans they had for the partnership would not come to fruition, yet they continued to represent to investors that the partnership was on track and expected to meet its goals. As such, the Court finds that the foregoing statements are not mere corporate puffery and denies Defendants' motion to dismiss as it relates to the foregoing statements.

189. With respect to scienter, the Court further concluded that plaintiffs had sufficiently pleaded facts supporting an inference that "Defendants agreed to a fundamentally flawed contract, knew early on that it was destined for failure, and continued to make public statements touting the partnership as a success to save face and their jobs." The Court also found that plaintiffs had sufficiently pleaded facts suggesting that Defendants knew of or recklessly disregarded information concerning "operational deficiencies, the vast capital expenditures required to execute the McDonald's partnership, and the success (or lack thereof) of the rollout by February 2025."

## DAMAGES TO KRISPY KREME

190. As a direct and proximate result of the Individual Defendants' misconduct, Krispy Kreme has incurred, and will continue to incur, losses and expenses amounting to millions of dollars.

191. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action, as well as any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

192. These expenditures also include, but are not limited to, the Company's exposure to class-wide damages in the Securities Class Action, which has survived a motion to dismiss and is proceeding toward discovery.

193. These losses also include, but are not limited to, substantial compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, such as bonuses linked to the Company's achievement of specific objectives, stock option awards inflated in light of the artificially inflated stock price, as well as other benefits provided to those Individual Defendants.

194. As a direct and proximate result of the Individual Defendants' actions, Krispy Kreme has suffered and will continue to suffer damage to its reputation and goodwill, along with a "liar's discount" that will negatively impact the Company's stock in the future. This is due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

195. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

196. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

197. Plaintiff is a current owner of Company stock and has continuously owned Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

198. Plaintiff understands the obligation to hold stock throughout the duration of this action and is prepared to do so.

199. During the Relevant Period, the Board consisted of the Director Defendants.

200. Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

201. The Company's Board is currently comprised of eight members: Defendants Charlesworth, Capel, and Deno (the "Demand Director Defendants"), as well as non-parties Patrick Grismer, Bernardo Hees, Easwaran Sundaram, David Shear, and Melissa Werneck (collectively, the "Demand Directors"). Thus, Plaintiff is only required to show that at least half of the Demand Directors, i.e., four, cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

202. Each of the Demand Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

203. Each of the Demand Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

204. Additionally, the Demand Directors receive payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Charlesworth**

205. Serving as the Company's CEO, Defendant Charlesworth received $3.69 million in compensation in 2025 and depends on Krispy Kreme for his income. The 2026 Proxy does not identify Charlesworth as independent under Nasdaq listing requirements.

206. During the Relevant Period, Defendant Charlesworth served as a director of the Company and had a duty to ensure the accuracy of the Company's SEC filings, press releases, and other public statements and presentations regarding its business, operations, prospects, internal controls, and financial statements. Charlesworth was further required to act in good faith and with due diligence to ensure that the Company maintained sufficiently robust and effective internal controls and/or that those controls were effectively implemented.

207. Through his conscious disregard of his oversight responsibilities, Defendant Charlesworth failed to oversee the Company's internal controls over financial reporting and its statements to regulators, investors, and the public. His failure to monitor Krispy Kreme's controls also resulted in a failure to protect the Company's corporate assets.

208. Through his participation in the misconduct described above, Defendant Charlesworth actively engaged in the conduct at issue. He signed the 2025 10-K and the Company's Forms 10-Q filed during the Relevant Period and made false and misleading statements regarding the viability and actual performance of the McDonald's partnership. Accordingly, Charlesworth faces a substantial likelihood of liability.

209. In addition, Defendant Charlesworth is a named defendant in the Securities Class Action.

210. As such, Defendant Charlesworth cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, as that would expose him to substantial liability and threaten his livelihood.

**Defendant Capel**

211. During the Relevant Period, Defendant Capel served as a director of the Company and had a duty to ensure the accuracy of the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements. Capel was further required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective and/or were being implemented effectively.

212. Through her conscious disregard of her oversight responsibilities, Defendant Capel failed to oversee the Company's internal controls over financial reporting and its statements to regulators, investors, and the public. Her failure to monitor Krispy Kreme's controls also resulted in a failure to protect the Company's corporate assets.

213. According to the 2026 Proxy, Defendant Capel received $363,231 in compensation for her service as a Company director. Accordingly, Capel cannot reasonably and objectively evaluate a demand to bring suit against the Board responsible for determining her continued compensation.

214. Through her participation in the misconduct described above, Defendant Capel actively engaged in the conduct at issue, including by signing the 2025 10-K. Accordingly, Capel faces a substantial likelihood of liability.

215. By knowingly or recklessly disregarding deficiencies in the Company's internal controls, Defendant Capel breached her fiduciary duties of loyalty and good faith through her

participation in the misconduct described above. Accordingly, Capel faces a substantial likelihood of liability for those breaches, rendering demand on her futile.

216. Beyond her service on Krispy Kreme's Board, Defendant Capel has been employed by JAB Holding Company ("JAB") since 2021, where she serves as Senior Partner and Global Head of Human Capital. Since April 2025, Hees has served as a Senior Advisor to JAB "with respect to its investments in the Company." Shear and Werneck also had business relationships with individuals affiliated with JAB, although the Board determined that those relationships did not "impair the independence of such directors." The 2026 Proxy further does not identify Capel as independent under Nasdaq listing requirements. These relationships, together with the Board's own determination regarding Capel, demonstrate that she is not independent.

**Defendant Deno**

217. During the Relevant Period, Defendant Deno served as a Company director and had a duty to ensure the accuracy of the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements. Deno was further required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective and/or were being implemented effectively.

218. By consciously disregarding his duty to monitor Krispy Kreme's controls, Defendant Deno failed to oversee the Company's internal controls over financial reporting and its statements to regulators, investors, and the public. Deno's failure to fulfill these oversight responsibilities resulted in his failure to protect the Company's corporate assets.

219. Based on the 2026 Proxy, Defendant Deno received $213,271 in compensation for his service as a Company director. Accordingly, Deno cannot reasonably and objectively evaluate a demand to bring suit against the Board responsible for determining his continued compensation.

220. Based on his participation in the misconduct described above, Defendant Deno actively engaged in the conduct at issue, including by signing the 2025 10-K. Accordingly, Deno faces a substantial likelihood of liability.

221. As Chair of the Audit Committee throughout the Relevant Period, Defendant Deno was responsible for reviewing earnings releases, overseeing disclosure controls and procedures, consulting with management regarding the Company's ethical environment, and reviewing and approving Krispy Kreme's Forms 10-Q and 10-K filed during the Relevant Period. Accordingly, Deno was responsible for knowingly or recklessly permitting the improper statements concerning the viability and actual performance of the McDonald's partnership.

222. By knowingly or recklessly disregarding deficiencies in the Company's internal controls, Defendant Deno breached his fiduciary duties of loyalty and good faith through his participation in the misconduct described above. Accordingly, Deno faces a substantial likelihood of liability for those breaches, rendering demand on him futile.

223. Based on their prior professional relationship at Yum! Brands, Inc., Defendant Deno and Grismer previously served as executives of the company. According to the 2026 Proxy, Deno served as Chief Financial Officer and then Chief Operating Officer of Yum! Brands, Inc. (formerly a subsidiary of PepsiCo). Grismer spent nearly 14 years as an executive at Yum! Brands, Inc., ultimately serving as Chief Financial Officer from 2012 to 2016. These prior working relationships between Deno and Grismer demonstrate that Deno is not independent.

**Non-Party Grismer**

224. Based on the 2026 Proxy, Grismer received $170,373 in compensation for his service as a Company director. Accordingly, he cannot reasonably and objectively evaluate a demand to bring suit against the Board responsible for determining his continued compensation.

225. Following nearly 14 years as an executive at Yum! Brands, Inc., Grismer ultimately served as Chief Financial Officer from 2012 to 2016. Defendant Deno likewise held senior positions at Yum! Brands, Inc., serving as Chief Financial Officer and then Chief Operating Officer. The prior working relationships between Grismer and Deno demonstrate that Grismer could not independently evaluate allegations of breach of duty against Deno. Likewise, he would be unable to fairly assess similar allegations against the other Defendants, as doing so would necessarily implicate the conduct of Deno.

**Non-Party Hees**

226. According to the 2026 Proxy, Hees received $322,695 in compensation for his service as a Company director. Accordingly, Hees cannot reasonably and objectively evaluate a demand to bring suit against the Board responsible for determining his continued compensation.

227. Apart from his service on Krispy Kreme's Board, Hees has served as a Senior Advisor to JAB since April 2025 "with respect to its investments in the Company." Defendant Capel has been employed by JAB since 2021, where she serves as Senior Partner and Global Head of Human Capital. Shear and Werneck also had business relationships with individuals affiliated with JAB, including Hees. The 2026 Proxy further does not identify Hees as independent under Nasdaq listing requirements. These relationships, together with the Board's own determination regarding Hees, demonstrate that he is not independent.

**Non-Party Shear**

228. Before joining Krispy Kreme's Board, Shear served as President, International of Restaurant Brands International Inc. ("RBI") from 2021 to 2024 and thereafter as an Advisor to RBI until March 2025. RBI was formed in 2014 through the merger of Burger King and Tim Hortons, and Shear had been employed by Burger King since 2011. During Shear's employment at Burger King, Hees served as CEO of Burger King Worldwide, Inc. and its predecessor from 2010 to 2013.

229. Beyond his role as a Krispy Kreme director, Shear has maintained business relationships with individuals affiliated with JAB, including Hees. The Board did not determine that Hees is independent under Nasdaq listing requirements. Although the Board concluded that those relationships did not "impair the independence of such directors," Hees' lack of independence, together with Shear's relationship with Hees, demonstrates that Shear is not independent.

**Non-Party Werneck**

230. During her tenure at Kraft Heinz from 2013 through 2026, Werneck served as Executive Vice President and Global Chief People Officer and, from August 2025 through April 2026, as an Executive Advisor. She currently serves as a consultant to Kraft Heinz's executive leadership team. Hees served as CEO of Kraft Heinz from 2015 through 2019, during which time Werneck was employed by the company in an executive position.

231. Beyond her service on Krispy Kreme's Board, Werneck has maintained business relationships with individuals affiliated with JAB, including Hees. The Board did not determine that Hees is independent under Nasdaq listing requirements. Although the Board concluded that those relationships did not "impair the independence of such directors," Hees' lack of

independence, together with Werneck's relationship with Hees, demonstrates that Werneck is not independent.

232. Thus, for all of the reasons set forth above, all of the Demand Directors, and, if not all of them, certainly at least four of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## CLAIMS FOR RELIEF

## COUNT I

### Against the Individual Defendants
### For Breach of Fiduciary Duties

233. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

234. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Krispy Kreme's business and affairs.

235. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Krispy Kreme.

236. In breach of their fiduciary duties owed to Krispy Kreme, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

237. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public

statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Krispy Kreme's securities.

238. The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent schemes set forth herein improperly and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to engage in the fraudulent schemes improperly and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Krispy Kreme's securities.

239. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

240. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Krispy Kreme has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

241. Plaintiff on behalf of Krispy Kreme has no adequate remedy at law.

## COUNT II

**Against the Individual Defendants**
**For Unjust Enrichment**

242. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

243. By their wrongful acts, violations of law, and false and misleading statements and omissions of material information and facts that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Krispy Kreme.

244. Each of the Individual Defendants received payment from Krispy Kreme, in the form of either salary or director fees, while actively breaching their fiduciary duties to Krispy Kreme.

245. All the payments and benefits provided to Defendants were at the expense of Krispy Kreme. The Company received no benefit from these payments.

246. Plaintiff, as a shareholder and a representative of Krispy Kreme, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

247. Plaintiff, on behalf of Krispy Kreme, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants For Waste of Corporate Assets

248. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

249. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Krispy Kreme to

waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

250. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

**COUNT IV**

**Against the Director Defendants**
**For Violating Section 14(a) of the Exchange Act**

251. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

252. Pursuant to Section 14(a) of the Exchange Act, "[i]t shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

253. Rule 14a-9, promulgated under Section 14(a) of the Exchange Act, prohibits proxy statements from containing "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

254. In the exercise of reasonable care, the Director Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in

the 2024 Proxy and 2025 Proxy were materially false and misleading. The misrepresentations and omissions were material to Krispy Kreme stockholders in voting on the matters set forth for stockholder determination in the 2024 Proxy and 2025 Proxy, including, but not limited to, election of directors, ratification of an independent auditor, and the approval (on an advisory basis) of executive compensation.

255. The false and misleading proxy statements caused the re-election of several Director Defendants to the Board, allowing them to continue breaching their fiduciary duties to Krispy Kreme.

256. As a direct and proximate result of the material misrepresentations and omissions in the 2024 Proxy and 2025 Proxy caused to be filed by the Director Defendants, the Company suffered damages.

257. Plaintiff, on behalf of Krispy Kreme, has no adequate remedy at law.

**COUNT V**

**Against the Individual Defendants**
**For Gross Mismanagement**

258. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

259. By their actions alleged herein, the Individual Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

260. As a direct and proximate result of the gross mismanagement and breaches of duty alleged herein, Krispy Kreme has sustained and will sustain significant damages.

261. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

262. Plaintiff, on behalf of Krispy Kreme, has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a) Declaring that Plaintiff may maintain this action on behalf of Krispy Kreme and that Plaintiff is an adequate representative of the Company;

b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Krispy Kreme;

c) Determining and awarding to Krispy Kreme the damages sustained by it, or disgorgement or restitution owed to it, as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d) Directing the Individual Defendants to take all necessary actions to reform and improve Krispy Kreme's corporate governance and internal procedures to comply with applicable laws and to protect Krispy Kreme and its shareholders from a repeat of the damaging events described herein;

e) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

f) Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 10, 2026

**BIELLI & KLAUDER, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst (No. 4788)
1204 N. King Street
Wilmington, DE 19801
Phone: (302) 803-4600
rernst@bk-legal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

JUSTIN A. KUEHN
MOLLY J. BROWN
**KUEHN LAW, PLLC**
53 Hill Street, Suite 605
Southampton, NY 11968
Telephone: (833) 672-0814
justin@kuehn.law
molly@kuehn.law